FIRST DISTRICT
SIXTH DIVISION
DECEMBER 23, 2010

Nos. 1-09-1361, 1-09-3173 (Cons.)

MICHAEL BENSON, EDWARD DOLINAR, )
JOEL STONE and WILLIAM F. JOHNSON, )
Individually and d/b/a WILLIAM F. JOHNSON, INC., )
an Illinois Corporation, )
 )
  Plaintiffs-Appellants and Cross-Appellees, )
 ) Appeal from the
v. ) Circuit Court of
 ) Cook County.
JOHN S. STAFFORD, JR., )
 ) No. 04 L 010671
  Defendant-Appellee and Cross-Appellant. )
 ) Honorable
 ) Lee S. Preston,
 ) Judge Presiding.
(Randall Gold, Michael Fox, and Edwin Durham, )
 )
  Cross-Appellees.) )
 )

JUSTICE ROBERT E. GORDON delivered the judgment of the court, with opinion.
Presiding Justice Garcia and Justice Cahill concurred in the judgment and opinion.

## OPINION

These consolidated appeals arise from a dispute concerning the sales of interests in two

joint ventures. Plaintiffs Michael Benson, Edward Dolinar, Joel Stone, and William F. Johnson

brought suit against defendant John Stafford, Jr., in the circuit court of Cook County, alleging

that defendant had breached his duty as a fiduciary in fact and had committed common law fraud,

including claims for affirmative fraud and fraudulent concealment. The trial court dismissed

plaintiffs' claim of affirmative fraud, and granted summary judgment in defendant's favor on the

claim of breach of fiduciary duty and on the claim of fraudulent concealment. The trial court

denied defendant's motion for sanctions against plaintiffs and their attorneys, Randall Gold,

Michael Fox, and Edwin Durham. Plaintiffs appeal, arguing that the trial court erred in dismissing

their affirmative fraud claim and in granting summary judgment on the breach of fiduciary duty

and fraudulent concealment claims. Defendant also appeals, arguing that the trial court should

have imposed sanctions on plaintiffs and their attorneys. We affirm.

BACKGROUND[1]

Defendant became an options trader on the Chicago Board Options Exchange (CBOE) in

1975, and at the time of the dispute in this case, had founded and headed the Stafford Group, an

options trading business which includes six firms with common ownership. Plaintiffs are traders

on the CBOE who have owned and operated trading companies for over 10 years; each has a

college education and several have master's degrees.

Plaintiffs' trading companies and defendant's trading companies formed two joint ventures

to own and operate "Designated Primary Market-Makers" (DPMs) on the CBOE.[2] Each of these

joint ventures consisted of one company affiliated with plaintiffs and one company affiliated with

defendant. Under the joint venture agreements, plaintiffs' company would control the daily

---

[1] Unless otherwise stated, all statements from the parties are based from testimony given during their depositions.

[2] A DPM is guaranteed a certain percentage of the trades in designated securities in exchange for maintaining orderly markets. A committee of the CBOE must approve the applications of companies that wish to obtain a DPM designation.

operations of the joint venture, while defendant's company would provide the capital and infrastructure.

Plaintiffs Benson, Stone, and Dolinar (Big Blue plaintiffs), along with nonparty John Hayden, formed Big Blue Trading, LLC (Big Blue), which entered into a joint venture agreement with GPZ Trading, LLC (GPZ), which was owned by defendant's two sons. The joint venture was formed to own and run the Big Blue DPM. Under the joint venture agreement, at the time of any sale, the four members of Big Blue would receive 80% of the proceeds, and GPZ would receive 20% of the proceeds. In exchange for its smaller share of the proceeds, GPZ had the right to veto any proposed sale.

Plaintiff Johnson was the sole shareholder of William F. Johnson, Inc. (Johnson, Inc.), which entered into a joint venture agreement with defendant in his individual capacity to own and run the Johnson DPM. Under their joint venture agreement, at the time of a sale, Johnson, Inc., would receive 70% of the proceeds and defendant would receive 30% of the proceeds. On December 1, 2001, three weeks before the sale of the joint venture, JSS Investments, Inc. (JSS), a company affiliated with defendant, was substituted for defendant as a party to the joint venture.

In February 2001, defendant decided to sell the Stafford Group and began marketing it to potential buyers. In spring 2001, defendant began negotiating with Toronto Dominion Bank (TD) to purchase some of defendant's business interests, including the Big Blue DPM and the Johnson DPM. Defendant and TD planned for GPZ and JSS to purchase the interests of their joint venture partners, and TD would acquire those interests when GPZ and JSS merged into a newly formed subsidiary of TD called TD Options, LLC (TD Options). As a result of their negotiations, TD

3

offered defendant a cash payment of between $150 and $200 million, as well as a similar "back-end" payment in the future that would be contingent on the performance of TD Options. Plaintiffs did not become aware of defendant's negotiations with TD or of his plans to sell their interests in the joint ventures until the summer of 2001.

As part of the agreement, TD offered defendant a single, aggregate sum for all of the business and technology assets that he was selling, including the DPM interests of defendant's joint venture partners. TD left it to defendant to reach an agreement with his joint venture partners about the price that they would accept for their interests, which would be deducted from defendant's aggregate payment.

In summer 2001, defendant met with plaintiffs and his other DPM partners. Defendant told them that TD was a potential buyer with whom he intended to negotiate. Defendant did not tell them that he already had a general offer for all of his business interests, including the interests of plaintiffs. Defendant sought plaintiffs' consent to his negotiating with TD for the sale of both his DPM interests and theirs. Defendant indicated that he was best suited to negotiate with TD because of his experience in the trading business, his knowledge of the market, and his familiarity with TD. Defendant also told plaintiffs that if they allowed him to negotiate with TD, they must allow him to negotiate alone and refrain from negotiating with TD themselves. Plaintiff Stone testified that when he asked whether plaintiffs could contact TD, defendant responded, "[T]his is my deal. I will negotiate for you guys. I'll get you the most I can. *** I'm in a better position to do so. I have experience, *** I don't want all you guys at the table." Stone testified that he responded "fine. Go ahead." Similarly, plaintiff Benson recounted that during the same meeting,

plaintiffs were told that if they were interested in negotiating with TD, "th[e] situation was going to be handled by [defendant]. *** [Defendant] would be representing our interests in the negotiations with the bank." The members of Big Blue agreed to allow defendant to negotiate with TD. Benson testified that the Big Blue plaintiffs trusted defendant to negotiate for the best possible purchase price, that they informed defendant that they trusted him, and that on the basis of that trust, they refrained from negotiating with TD directly. Dolinar also testified that he trusted defendant with respect to the TD sale, and that he had trusted defendant on various other business matters for a number of years. Johnson also agreed to allow defendant to negotiate with TD, testifying that he did so because he trusted defendant; Johnson opined that defendant "was someone I respected. *** In my eyes I had hitched myself to a star, and if he said this was going to be a good thing then I trusted that this was going to be a good thing."

*Big Blue DPM/Joint Venture*

While defendant was negotiating with TD, the members of Big Blue had continued to approach other parties, as defendant had suggested, including Susquehanna and Tag Van Der Molen. They had received a tentative offer from Spear, Leeds & Kellogg (SLK), a subsidiary of Goldman Sachs, to purchase the entire Big Blue DPM, including GPZ's interest, for $17 or $18 million. The members of Big Blue did not accept the offer at that point, because they needed to speak to defendant about it first.

The Big Blue members met with defendant, and defendant told them that "TD was willing to offer" $6 million in cash, with up to $6 million in contingent "back-end" payments. Stone testified that he informed defendant that they had an offer from another party for $17 or $18

5

million in upfront cash, and Hayden reluctantly told defendant that the offer was from SLK. Defendant responded, "I don't care if SLK offers you 20 million. I'm not going to let you sell it," and said that he would use his veto power to block the sale to SLK; there was evidence that TD highly desired the Big Blue DPM. Martin Fiascone, an associate of defendant's, characterized the dispute over the SLK bid as "a little cat fight" that "got pretty intense at times." Fiascone also testified that "[t]here was no love in the room between those guys [the DPM owners and defendant]. Behind closed doors, there was no love in the room." Hayden, the nonparty Big Blue member, testified that he viewed the process as adversarial.

Defendant testified that he spoke to an individual at Goldman Sachs and expressed his opinion that it was a conflict of interest for SLK to make a bid for the Big Blue DPM, because Goldman Sachs was involved with the TD transaction and had a large amount of confidential information about defendant and his business strategies. Fiascone also testified that defendant spoke to Goldman Sachs and told them, "I don't want SLK competitively bidding on my own DPMs." Shortly thereafter, SLK informed plaintiff Benson that while it had been willing to pay in the range of $17 to $18 million for the Big Blue DPM, it could not continue with the negotiations.

In August 2001, after SLK had withdrawn its offer, the Big Blue members retained attorney David Bohan, from the law firm of Sachnoff & Weaver (Sachnoff), in order to determine whether the veto provision could be enforced against them as defendant had threatened. Bohan described the subject of the representation as "Dispute with Joint Venture Partner," but Stone testified that he did not feel as though he had a dispute with defendant or GPZ at the time, and did not entertain the idea of bringing a lawsuit against defendant. The members of Big Blue were also

concerned over whether defendant could sue them if they pursued a deal with SLK, and Bohan considered litigation at least a possibility at that stage; a note from one of the plaintiffs suggests that they play "hardball."

Between late August and October 2001, six Sachnoff attorneys spent hundreds of hours on the matter at a cost of approximately $60,000. Bohan and Douglas Newkirk, a Sachnoff transactional attorney with expertise in joint venture partners' legal obligations, advised the Big Blue members that defendant had the right to withhold consent from a sale, but that the right was limited. Bohan and Newkirk considered defendant to be the Big Blue members' "partner" in their joint venture and advised them that they should stress to defendant that in exercising his veto power, he owed them an obligation as their partner to exercise his power in good faith and to obtain the best possible price for their DPM interests.

The Big Blue members asked defendant to counter the previous offer from TD to $15 million, to be paid over three years. Benson testified that TD was not receptive to the counteroffer. Defendant responded with a counteroffer of $16 million, with $8 million to be paid upfront and another $8 million in contingent "back-end" rights. Stone testified that defendant told him that the "train's leaving the station." Stone relayed the offer to the Big Blue members. They agreed that since the SLK offer had disappeared, and because Hayden had indicated that there were some threats by defendant that he would sue them and "squash [them] like bugs" if they did not go forward with the deal, they accepted the offer.

*Johnson DPM/Joint Venture*

Johnson also testified that he pursued opportunities with other firms. He said that he

received a tentative oral offer of $5 million for his interest from SLK, but the negotiations ended after Johnson made a counteroffer of $9 million. Johnson stated that he did not mention the bid to defendant because "it was too early in the process to get back to him."

In September 2001, plaintiff Johnson met with defendant and defendant's negotiator, who told Johnson that the amount TD was willing to pay for Johnson's share of the Johnson DPM was $1.75 million in cash and rights for up to $2.625 million in "back-end" payments. The next day, Johnson approached defendant on the trading floor of the CBOE and asked, "is this the most that TD is willing to pay for the DPM?" Defendant responded that it was. Shortly thereafter, Johnson told defendant that he was "on board" with the offer and testified that he did so because "[t]he overall package I felt was going to be more lucrative than anything else," although he did not want to sign a memorandum of understanding until more details were included. Johnson did not consult with an attorney before accepting the offer.

TD's lead negotiator testified that TD never told defendant that TD would be willing to pay more for the DPMs, and documents prepared by TD showed that TD valued the interests at the price that it had paid. TD's investment banker also testified that TD never placed a higher value on the DPM interests than the amount that they paid.

*Specialist Purchase Agreements/TD Options Agreements*

In early December 2001, plaintiffs received draft specialist purchase agreements (SPAs), which they were to enter into with TD. Plaintiffs, including both the Big Blue members and Johnson, engaged another Sachnoff attorney, Bill Doran, to advise them concerning the SPAs. Doran and another Sachnoff attorney discovered that the tax treatment of the back-end payments

was different than plaintiffs had anticipated, so the parties agreed to "gross up" the amount of the potential back-end payments. Plaintiff Dolinar also testified that the Big Blue members added a provision that their employment with TD Options would only last one year.

The SPAs provided that plaintiffs would sell their DPM interests directly to TD, rather than to defendant's companies as originally agreed. The upfront payment was in Class A shares, which would then be sold for cash, while the "back-end" payments were Class B-3 shares. Additionally, defendant was not made a party to the SPAs but entered into a separate master purchase agreement (MPA) with TD to sell his business interests, including his DPM interests. Since the SPAs did not reflect the compensation that defendant was to receive, plaintiffs added a provision to their SPAs warranting that the amount of compensation received by defendant and his family members would not be disproportionate to his companies' interests in the DPMs.

In addition to the warranty provision, the SPAs and TD Options agreements that plaintiffs also entered into contained several other representations, including statements that plaintiffs were sophisticated investors and had the ability to make independent and competent decisions to enter into the transaction and statements that plaintiffs had the opportunity to obtain relevant documents and information and to ask questions of TD's management about the transaction.

Section 6.7 of the SPAs provided that the parties did not rely on any representations not set forth in the SPA:

> "6.7    Entire Agreement.  This Agreement (including the
>
> documents referred to herein) constitutes the entire agreement
>
> among the Parties with respect to the subject matter hereof.  There

are no warranties, conditions, or representations (including any that may be implied by statute) and there are no agreements in connection with such subject matter except as specifically set forth or referred to in this Agreement.  No reliance is placed on any warranty, representation, opinion, advice or assertion of fact made either prior to, contemporaneous with, or after entering into this Agreement, or any amendment or supplement thereto, by any Party or its directors, officers, employees or agents, to any other Party or its directors, officers, employees or agents, except to the extent that the same has been reduced to writing and included as a term of this Agreement, and none of the Parties has been induced to enter into this Agreement or any amendment or supplement by reason of any such warranty, representation, opinion, advice or assertion of fact. Accordingly, there shall be no liability, either in tort or in contract, assessed in relation to any such warranty, representation, opinion, advice or assertion of fact, except to the extent contemplated above."

Section 3.1(d)(viii) of the TD Options agreement also provided a nonreliance clause:

"(d)    Representations and Warranties of Members. Each Member hereby represents and warrants to the Company and to each other Member and acknowledges that: *** (viii) the

10

determination of such Member to acquire Units in the Company has

been made by such Member independent of any other Member and

independent of any statements or opinions as to the advisability of

such acquisition or as to the properties, business, prospects or

condition (financial or otherwise) of the Company and its

Subsidiaries which may have been made or given by any other

Member or by any agent, employee or other Affiliate of any other

Member."

*Circuit Court Proceedings*

In 2004, plaintiffs[3] filed suit against TD, alleging that TD had fraudulently induced them into selling their interests in the DPMs and that TD had mismanaged TD Options, preventing plaintiffs from receiving their performance-based "back-end" payments. Defendant was not a party to the case, although plaintiffs asked him to join them as a plaintiff, which defendant refused.

Plaintiffs amended their complaint to add defendant to the case as a defendant. In their first amended complaint, plaintiffs alleged that defendant had acted as TD's agent while negotiating against plaintiffs and had breached the fiduciary duties owed between joint venture partners.[2] Defendant moved to dismiss the claims pursuant to section 2-615 of the Code of Civil

---

[3] Michael Hoban, d/b/a HOB Corp., was also a plaintiff in the underlying case. However, he is not a party to this appeal.

[2] Plaintiffs also brought claims against TD and TD Options, which have since been settled.

Procedure (Code) (735 ILCS 5/2-615 (West 2008)), arguing that he was not a member of either joint venture and therefore owed plaintiffs no fiduciary duty. He also argued that if he was TD's agent, he could not have owed plaintiffs fiduciary duties. Plaintiffs then amended their complaint a second time and abandoned those claims.

In their second and third amended complaints, plaintiffs alleged that defendant had been acting as plaintiffs' agent during negotiations with TD and had breached his duties as their agent. The trial court dismissed both of these claims because plaintiffs did not allege sufficient facts to support the elements of agency.

Plaintiffs amended their complaint a fourth time. In their fourth amended complaint, plaintiffs alleged that defendant was their fiduciary in fact. The trial court denied defendant's motion to dismiss the fourth amended complaint pursuant to section 2-615 of the Code, holding that plaintiffs had alleged a fiduciary relationship with defendant with sufficient particularity and that a fraudulent concealment claim was present in count II, and parties proceeded with discovery; the trial court did, however, hold that plaintiffs could not raise an affirmative fraud claim under count II as a matter of law because of nonreliance clauses present in their SPAs.

In their expert witness disclosures, plaintiffs included damages calculations indicating what the value of the DPMs would have been had plaintiffs been aware of the facts underlying the transaction.

In a written interrogatory, defendant requested plaintiffs to identify everyone they consulted regarding the sale of the DPM joint ventures. Plaintiffs identified only Doran, the attorney who worked with them on the final agreements. Defendant also sought production of

Sachnoff's files regarding their representation of plaintiffs. Plaintiffs claimed that the documents were protected by the attorney-client privilege. Defendant moved to compel production, and plaintiffs argued both that the attorney-client privilege applied and that the documents were protected under the work product doctrine. Plaintiffs also argued against an *in camera* review of the documents, claiming that they were irrelevant. The trial court ordered an *in camera* review and, after reviewing the documents, ordered their production.

After receiving the Sachnoff documents, defendant's counsel sent a letter to plaintiffs' counsel stating that the documents showed plaintiffs' claims were unfounded and urged plaintiffs to withdraw their claims. The letter also stated that if they withdrew their claims immediately, defendant would not seek sanctions; if they did not withdraw their claims, then defendant would "seek sanctions encompassing all expenses and legal fees [defendant] has incurred since [plaintiffs] initiated this litigation." Plaintiffs did not respond to the letter.

When discovery terminated, defendant moved for summary judgment pursuant to section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2008)). Three weeks after oral argument, the trial court granted defendant's motion for summary judgment, rejecting plaintiffs' fiduciary in fact argument as a matter of law. The trial court held that defendant did not owe plaintiffs a fiduciary duty as a matter of fact and had not engaged in fraudulent concealment.

After summary judgment was granted, defendant moved for the imposition of sanctions under Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994) on the basis that plaintiffs' arguments were not well grounded in fact or law. The trial court denied sanctions, holding that plaintiffs' claims "could arguably have been well-grounded and warranted by existing law or by -- and I'm

13

Nos. 1-09-1361, 1-09-3173 (Cons.)

highlighting this -- a good-faith argument for the extension, modification, or reversal of existing law." These appeals follow.

ANALYSIS

On appeal, plaintiffs argue that the trial court erred in granting summary judgment in defendant's favor on their fiduciary in fact and fraudulent concealment claims. They also argue that the trial court should not have dismissed their claim for affirmative fraud. Defendant also appeals, challenging the trial court's denial of sanctions against plaintiffs and their attorneys.

*Summary Judgment Claims*

Plaintiffs first argue that the trial court erred in granting summary judgment in defendant's favor on their fiduciary in fact and fraudulent concealment claims. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision on a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

"Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for

14

summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

" 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). " 'To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim.' " *Schrager*, 328 Ill. App. 3d at 708 (quoting *Luu*, 323 Ill. App. 3d at 952). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

Fiduciary In Fact Claim

Plaintiffs first argue that the trial court should not have granted summary judgment on their claim that they were in a fiduciary relationship with defendant. " 'A fiduciary duty is the duty of an agent to treat his principal with the utmost candor, rectitude, care, loyalty, and good faith – in fact to treat the principal as well as the agent would treat himself.' [Citation.]" *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 21 (1995). A fiduciary relationship may occur as a matter of law, or it may arise "as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former." *State*

Nos. 1-09-1361, 1-09-3173 (Cons.)

*Security Insurance Co. v. Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 595 (1994) (citing *In re Estate of Rothenberg*, 176 Ill. App. 3d 176, 179 (1988)). Plaintiffs have not argued that their relationship with defendant results in a fiduciary relationship by law; thus, they must show that a fiduciary relationship existed based on the particular circumstances of their case. The party asserting the fiduciary relationship based on "special circumstances" must prove its existence by clear and convincing evidence. *State Security*, 258 Ill. App. 3d at 595.

The mere fact that the parties have engaged in business transactions or have a contractual relationship is not itself sufficient to establish a fiduciary relationship. *State Security*, 258 Ill. App. 3d at 597. To determine whether a fiduciary relationship exists, courts look at factors including the degree of kinship between the parties, the disparity in age, health, education, or business experience between the parties, and the extent to which the servient party entrusted the handling of its business to the dominant party and placed its trust and confidence in it. *Ransom v. A.B. Dick Co.*, 289 Ill. App. 3d 663, 673 (1997); *State Security*, 258 Ill. App. 3d at 597; *Pottinger v. Pottinger*, 238 Ill. App. 3d 908, 917 (1992); *Santa Claus Industries, Inc. v. First National Bank of Chicago*, 216 Ill. App. 3d 231, 238 (1991); *Badger Building Corp. v. Gregoric*, 102 Ill. App. 3d 594, 597-98 (1981). However, while certain factors have been identified as supporting a fiduciary in fact claim, our Illinois Supreme Court has refused to set precise boundaries for the existence of a fiduciary relationship. *Illinois Rockford Corp. v. Kulp*, 41 Ill. 2d 215, 222 (1968).

"Generally, where parties capable of handling their business affairs deal with each other at arm's length, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged servient party, no fiduciary relationship will be deemed to exist." *State*

16

Nos. 1-09-1361, 1-09-3173 (Cons.)

*Security*, 258 Ill. App. 3d at 597-98 (citing *De Witt County Public Health Building Comm'n v. County of De Witt*, 128 Ill. App. 3d 11, 26 (1984)). The "essence" of a fiduciary relationship is dominance of one party by the other. *Lagen*, 274 Ill. App. 3d at 21. "Indeed, in the absence of dominance and influence there is no fiduciary relationship regardless of the level of trust between the parties." *Lagen*, 274 Ill. App. 3d at 21.

In the case at bar, we cannot find that there was a fiduciary relationship between defendant and plaintiffs. It is clear that the age, health, and kinship factors do not provide a basis for imposition of a fiduciary duty; the parties do not argue otherwise. Instead, plaintiffs argue that defendant had a "very substantially superior" level of business experience, including experience in valuing and selling trading businesses. They claim that defendant's level of experience, combined with his promise to negotiate for them with TD, led plaintiffs to trust defendant and placed defendant in a position of superiority and control. We find plaintiffs' argument unpersuasive.

First, plaintiffs have not provided sufficient facts to support a finding that they trusted defendant. Plaintiffs' argument that they trusted defendant rests solely on their testimony. For instance, Benson testified that the Big Blue plaintiffs trusted defendant to negotiate for the best possible purchase price, that they informed defendant that they trusted him, and that on the basis of that trust, they refrained from negotiating with TD directly. Johnson also testified that he agreed to the TD sale because he trusted defendant. Johnson opined that defendant "was someone I respected. *** In my eyes I had hitched myself to a star, and if he said this was going to be a good thing then I trusted that this was going to be a good thing."

However, while plaintiffs say that they trusted defendant, their actions show that they did

17

not. They retained legal counsel to advise them as to whether defendant could veto the deal with SLK, and Fiascone characterized the dispute as "a little cat fight" that "got pretty intense at times." Additionally, Hayden, the nonparty Big Blue member, viewed the process as adversarial. Plaintiffs also vowed to play "hardball" with defendant, who had threatened to "squash [them] like bugs." Johnson also refused to sign a memorandum of understanding, and all of the plaintiffs negotiated a warranty that defendant had not received any "side consideration" for the TD transaction. Thus, the evidence establishes that plaintiffs did not place their trust in defendant.

Plaintiffs attempt to distinguish their feelings about defendant concerning his use of the veto provision from their trust in him to negotiate a price with TD. They argue that while they may have had anger toward defendant concerning his veto power, that did not have any effect on their trust in defendant to negotiate with TD. Plaintiffs also use a similar argument to distinguish the negotiation of the warranty provision. However, even if plaintiffs' feelings can be separated from their trust in defendant, we cannot examine plaintiffs' dealings with defendant in a vacuum. The determination of whether there is a fiduciary relationship depends on an analysis of the circumstances (see, *e.g.*, *State Security*, 258 Ill. App. 3d at 595), and the facts establishing the relationship of the parties include more than the narrow set of facts on which plaintiffs focus.

Moreover, even if we were to find that plaintiffs provided sufficient evidence to show that they trusted defendant, " '[t]he fact that one party trusts the other is insufficient' " to establish a fiduciary relationship. *Lagen*, 274 Ill. App. 3d at 21 (quoting *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992)). Even if plaintiffs trusted defendant, they cannot demonstrate that they were dominated by him.

Nos. 1-09-1361, 1-09-3173 (Cons.)

Plaintiffs place great reliance on the Illinois Supreme Court decision of *Illinois Rockford Corp. v. Kulp*, 41 Ill. 2d 215. In that case, Kulp and Leeb were equal shareholders of the Pullman Couch Company. *Kulp*, 41 Ill. 2d at 216. The company was having financial problems, so Kulp attempted to sell all of the company's stock, telling Leeb that Kulp would inform him if it appeared as though Kulp had found a prospective buyer. *Kulp*, 41 Ill. 2d at 218. Kulp found a purchaser, who offered him and Leeb $25,000 each; the purchaser and Kulp both assured Leeb that Kulp was not receiving more than $25,000 for his shares. *Kulp*, 41 Ill. 2d at 219. In fact, Kulp had negotiated for additional compensation. *Kulp*, 41 Ill. 2d at 220-21.

The Illinois Supreme Court held that there was a fiduciary relationship between Kulp and Leeb by virtue of their relationship. *Kulp*, 41 Ill. 2d at 222. It noted that " '[t]heir decision to form and operate as a corporation rather than a partnership does not change the fact that they were embarking on a joint enterprise, and their mutual obligations were similar to those of partners.' " *Kulp*, 41 Ill. 2d at 222 (quoting *Tiller v. Shippee*, 12 Ill. 2d 616, 624 (1958)). The court focused on the facts that Kulp and Leeb had been close personal friends for a long period of time and did not acquire the Pullman stock independently; the court also noted that if the tax advantages had favored a partnership, the two would have formed a partnership instead of a corporation. *Kulp*, 41 Ill. 2d at 222-23.

Despite plaintiffs' arguments to the contrary, *Kulp* has generally been considered to stand for the proposition that shareholders in a closely held corporation owe each other fiduciary duties, and nearly all of the Illinois cases applying *Kulp* substantively use it in the corporate context. See, *e.g.*, *Visvardis v. Eric P. Ferleger, P.C.*, 375 Ill. App. 3d 719, 725 (2007); *Hagshenas v.*

19

Nos. 1-09-1361, 1-09-3173 (Cons.)

*Gaylord*, 199 Ill. App. 3d 60, 69 (1990). Additionally, *Kulp* refers to the mutual obligations of the shareholders, not to the case of a unilateral fiduciary duty, as is the case when a fiduciary in fact relationship is claimed.

Moreover, the factual circumstances of *Kulp* are distinguishable from those in the case at bar. Kulp and Leeb had been "close business and personal friends for a long period of time," and "[e]ach did not proceed independently of the other to acquire the Pullman stock." *Kulp*, 41 Ill. 2d at 222. In this case, however, defendant and plaintiffs did not have such a relationship; the parties knew of each other from their interactions at the CBOE, but did not have a relationship until they entered into the DPM joint ventures. Additionally, plaintiffs and defendant were not the actual parties to the joint venture. In the case of the Big Blue plaintiffs, the parties were Big Blue Trading, LLC and GPZ; in Johnson's case, the parties at the time of the sale were Johnson, Inc. and JSS. Thus, we find *Kulp* distinguishable from the case at bar.

After examining the actions of the parties, it is apparent that plaintiffs were not dominated by defendant. All of the parties in this case were sophisticated businessmen who had been involved with options trading on the CBOE for a number of years, and represented that they were sophisticated parties in their contracts. While defendant may have had more experience, there is not a gross disparity between the amount of knowledge of defendant and plaintiffs; indeed, plaintiffs, and not defendant, were in charge of the day-to-day operations of the DPMs. Even if defendant did have slightly more experience in the actual selling of trading businesses, " '[n]ormal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship.' " *Gary-*

20

Nos. 1-09-1361, 1-09-3173 (Cons.)

*Wheaton Bank v. Burt*, 104 Ill. App. 3d 767, 774 (1982) (quoting *Carey Electrical Contracting, Inc. v. First National Bank*, 74 Ill. App. 3d 233, 238 (1979)).

Additionally, plaintiffs continued to market their DPMs to other buyers without input from defendant throughout the negotiations with TD. While Johnson did not enter into serious negotiations, he did speak with other firms regarding his interest. The Big Blue plaintiffs, on the other hand, were in the process of negotiating an offer from SLK when defendant stopped the transaction and had several discussions with the firm; indeed, when defendant thwarted the transaction, the Big Blue plaintiffs sought legal advice about whether his actions were permissible and whether defendant could sue them if they pursued a deal with SLK.

Furthermore, plaintiffs did not blindly accept the offers that defendant first made them. The Big Blue plaintiffs did not accept the first offer from defendant, and made a counteroffer, which, while rejected, led to an increase in the purchase price of several millions of dollars. While Johnson never made a counteroffer, he did ask defendant whether the amount defendant offered was the most that TD was willing to pay for the DPM; he also refused to sign a memorandum of understanding until there were more details. All of the plaintiffs also negotiated an adjustment in the back-end price and added a warranty to their terms. They also all ultimately retained the right to accept or reject the TD deal. See *State Security*, 258 Ill. App. 3d at 598 ("the terms of the Agreement denying defendants the power to bind plaintiff belie any notion that plaintiff was a servient party placing its trust and confidence in defendants' recommendations").

Finally, plaintiffs had the advice of attorneys at various points throughout the negotiations. We agree with defendant that the presence of the Sachnoff attorneys weighs against a finding of

21

Nos. 1-09-1361, 1-09-3173 (Cons.)

fiduciary duty. Plaintiffs argue that the presence of an attorney is simply one factor to be considered with all of the other circumstances of the case to determine if the requisite trust and control is present, and point to *Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 984 (7th Cir. 1978) (applying Illinois law), as support. However, we find *Roberts* inapposite.

In *Roberts*, the plaintiff, an 18-year-old employee of the defendant with a high school education and no business experience, showed defendant a tool that plaintiff had invented in his spare time. *Roberts*, 573 F.2d at 978. The plaintiff entered into an agreement with the defendant, assigning it the rights to the tool. *Roberts*, 573 F.2d at 979. The plaintiff was represented by counsel during the transaction, but there was some question as to counsel's independence. *Roberts*, 573 F.2d at 979. The plaintiff later filed suit against the defendant, asserting, in part, that the defendant had breached a confidential relationship; a jury found in the plaintiff's favor. *Roberts*, 573 F.2d at 980.

On appeal, the defendant argued that the plaintiff could not have relied on defendant because he was represented by counsel. *Roberts*, 573 F.2d at 983. The Seventh Circuit noted that the presence of an attorney was one factor to be considered along with all of the other circumstances in the case. *Roberts*, 573 F.2d at 984. It stated that the jury was instructed on the issue, and "obviously rejected" the defendant's argument, which the court found no basis to disturb. *Roberts*, 573 F.2d at 984.

The factual situation present in *Roberts* is quite different from that of the case at bar. Here, independent counsel was present at various points throughout the transaction. Sachnoff attorneys consulted with the Big Blue plaintiffs at the time that the SLK offer was pending, and

22

consulted with all of the plaintiffs at the time that the SPAs were to be signed. Based on some of the documents prepared by the Sachnoff attorneys, they were advising the Big Blue plaintiffs as to how to proceed in their negotiations with defendant about the price offered by TD and felt that plaintiffs and defendant were in an adversarial relationship. While there is some dispute as to whether the Sachnoff attorneys did advise the Big Blue plaintiffs as to price, there is no dispute that they advised all of the plaintiffs prior to the execution of the SPAs and TD Options agreements.

Moreover, the Sachnoff attorneys did not merely review the contracts but assisted plaintiffs in obtaining changes to the terms. They increased the amount of the potential back-end payments after the tax treatment in the contract was different than plaintiffs had anticipated. A provision indicating that the Big Blue plaintiffs' employment with TD Options would only last one year was also added, as was the warranty that defendant and his family would not receive compensation that was disproportionate to their interests in the DPMs.

While the presence of counsel is one factor to be considered in determining whether plaintiffs were dominated by defendant, we agree with defendant that it is an important factor. The involvement of the Sachnoff attorneys during the transaction thus weighs heavily against a finding of dominance, and examining the actions of plaintiffs throughout the transaction shows that they were not the actions of parties who were "dominated" by defendant. Accordingly, we cannot find that plaintiffs have presented sufficient evidence to show that they were dominated by defendant. Since plaintiffs have been unable to demonstrate that they placed great trust in defendant and that defendant dominated them as a result of that trust, we must affirm the trial

Nos. 1-09-1361, 1-09-3173 (Cons.)

court's grant of summary judgment in defendant's favor.

Fraudulent Concealment Claim

Plaintiffs also argue that the trial court erred in granting summary judgment in defendant's favor on their claim for fraudulent concealment. The trial court granted summary judgment in defendant's favor based on the conclusion that plaintiffs had not shown that they placed great trust and confidence in defendant to negotiate the best price for their DPMs and so defendant did not have a duty to speak.

In order to show fraudulent concealment, a plaintiff must prove "that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500 (1996). A duty to disclose a material fact can arise under several circumstances, including when plaintiff and defendant "are in a fiduciary or confidential relationship" or in a situation where "plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff. [Citations.] This position of superiority may arise by reason of friendship, agency, or experience." *Connick*, 174 Ill. 2d at 500. Fraudulent concealment must be proved by clear and convincing evidence. See *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 706-07 (2002).

In the case at bar, as noted, we cannot find that plaintiffs and defendant were in a fiduciary relationship. Thus, fraudulent concealment cannot be shown on that basis.

However, even in the absence of a fiduciary relationship, fraudulent concealment may be shown where "plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Connick*, 174 Ill. 2d at 500. While this

24

standard is very similar to the standard for creation of a fiduciary relationship, it is possible for a defendant to owe a duty to speak under the "trust and confidence" standard while not being in a fiduciary relationship with the plaintiff. See, *e.g.*, *Schrager*, 328 Ill. App. 3d at 708-09.

For instance, in *Schrager*, the plaintiff spoke to the defendants about a potential investment in a real estate venture. *Schrager*, 328 Ill. App. 3d at 700. The plaintiff asked the defendants to tell him anything they could about the current investors and the project. *Schrager*, 328 Ill. App. 3d at 700. The defendants responded that the investors were " 'excellent real estate developers, very good customers of the bank, and very good business men [*sic*].' " *Schrager*, 328 Ill. App. 3d at 700. In fact, the defendants knew that the investors were often late on their payments, that the account for the venture was frequently overdrawn, and that one of the investors was involved in bankruptcy proceedings. *Schrager*, 328 Ill. App. 3d at 705-06.

The trial court found that there was no fiduciary relationship between the plaintiff and the defendants, and we agreed on appeal. *Schrager*, 328 Ill. App. 3d at 707. However, we nonetheless found that there was a duty to disclose because the record contained facts supporting an inference that "defendants entered into a relationship of confidence and trust with [the plaintiff], in which defendants' superior knowledge and experience of [the investors'] financial history, as well as the status of the *** development project, including the necessity of a fresh guarantor, placed defendants in a position of influence over [the plaintiff]." *Schrager*, 328 Ill. App. 3d at 708-09.

In the case at bar, we cannot find that plaintiffs have demonstrated that they entered into a relationship of confidence and trust which placed defendant in a position of influence over them.

As noted, this standard is extremely similar to that of a fiduciary relationship. The analysis that led to the conclusion that there was no fiduciary relationship is equally applicable here. Plaintiffs cannot show that they trusted defendant, and even if they did trust defendant, that trust did not result in defendant having a position of influence and superiority over them. Thus, defendant had no duty to disclose.

Plaintiffs also raise two other bases for finding that defendant had a duty to disclose material facts regarding the TD transaction. They argue that defendant's active concealment of his conduct gave rise to a duty to speak and that defendant additionally assumed a duty to speak truthfully and accurately by making statements to plaintiffs about TD's offers. Defendant argues that these new arguments are waived because plaintiffs did not raise them on summary judgment and they were not considered by the trial court.

An argument that has not been raised in the trial court cannot be raised for the first time on appeal, even in the case of a summary judgment. *Lajato v. AT&T, Inc.*, 283 Ill. App. 3d 126, 136 (1996). Plaintiffs did not raise these alternative bases for a duty to speak before the trial court on summary judgment, and the trial court did not consider them in its decision. Plaintiffs urge us to consider their new arguments despite any forfeiture. While we may elect to address a waived argument to reach a just result (*Chubb Insurance Co. v. DeChambre*, 349 Ill. App. 3d 56, 60 (2004)), in this case, we are unpersuaded that the grant of summary judgment should be disturbed.

Damages

Defendant also raises the issue of damages as an alternative basis for affirming the trial

26

court's grant of summary judgment in his favor. Although the trial court did not rely on the issue of damages in its summary judgment order, we may affirm the grant of summary judgment on any basis appearing in the record. See *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d at 50. Since we affirm the grant of summary judgment on the fiduciary in fact and fraudulent concealment bases relied on by the trial court, we have no need to discuss any alternative bases.

*Affirmative Fraud Claim*

Finally, plaintiffs challenge the trial court's dismissal of their claim for affirmative fraud. Defendant's motion to dismiss plaintiffs' fourth amended complaint was denied, but the trial court held that to the extent that count II of the fourth amended complaint included an affirmative fraud claim, that claim was barred by the presence of a nonreliance clause in the SPAs.

A motion to dismiss under section 2-615 of the Code (735 ILCS 5/2-615 (West 2008)) is a challenge to the legal sufficiency of the complaint. *Iseberg v. Gross*, 366 Ill. App. 3d 857, 860 (2006). In reviewing the legal sufficiency of the complaint, we regard all well-pled facts as true and draw all reasonable inferences in favor of plaintiffs. *Iseberg*, 366 Ill. App. 3d at 860. We construe the complaint liberally and dismiss only when it appears that plaintiffs cannot recover under any set of facts. *Iseberg*, 366 Ill. App. 3d at 861. The standard of review from the granting of a section 2-615 motion to dismiss is *de novo*. *Flournoy v. Ameritech*, 351 Ill. App. 3d 583, 586 (2004).

In the case at bar, the trial court dismissed the affirmative fraud component of count II of plaintiffs' fourth amended complaint due to the presence of a nonreliance clause in the SPAs that plaintiffs signed. The clause, located in section 6.7 of the SPAs, provided:

"6.7    Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties with respect to the subject matter hereof.  There are no warranties, conditions, or representations (including any that may be implied by statute) and there are no agreements in connection with such subject matter except as specifically set forth or referred to in this Agreement.  *No reliance is placed on any warranty, representation, opinion, advice or assertion of fact made either prior to, contemporaneous with, or after entering into this Agreement, or any amendment or supplement thereto, by any Party or its directors, officers, employees or agents, to any other Party or its directors, officers, employees or agents, except to the extent that the same has been reduced to writing and included as a term of this Agreement*, and none of the Parties has been induced to enter into this Agreement or any amendment or supplement by reason of any such warranty, representation, opinion, advice or assertion of fact.  Accordingly, there shall be no liability, either in tort or in contract, assessed in relation to any such warranty, representation, opinion, advice or assertion of fact, except to the extent contemplated above."  (Emphasis added.)

Additionally, although the trial court did not discuss it, defendant claimed that section

3.1(d)(viii) of the TD Options agreement also provided a nonreliance clause:

"(d)      Representations and Warranties of Members. Each

Member hereby represents and warrants to the Company and to

each other Member and acknowledges that: *** (viii) the

determination of such Member to acquire Units in the Company has

been made by such Member independent of any other Member and

independent of any statements or opinions as to the advisability of

such acquisition or as to the properties, business, prospects or

condition (financial or otherwise) of the Company and its

Subsidiaries which may have been made or given by any other

Member or by any agent, employee or other Affiliate of any other

Member."

Defendant argued, and the trial court agreed, that the presence of a nonreliance clause barred plaintiffs from bringing a claim for affirmative fraud as a matter of law. We agree.

To state a claim for fraud, a plaintiff must allege five elements: "(1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance." *State Security*, 258 Ill. App. 3d at 592 (citing *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (1980)). As part of its fraud claim, a plaintiff must allege that its reliance on the misrepresentation was justified. *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, 125 (1995). "In determining

29

whether reliance was justifiable, all of the facts which the plaintiff knew, as well as those facts the plaintiff could have learned through the exercise of ordinary prudence, are taken into account." *Adler*, 271 Ill. App. 3d at 125.

One factor that courts have considered in analyzing justifiable reliance is the presence of a non-reliance clause in a contract between the parties. See *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 457 (2004); *Adler*, 271 Ill. App. 3d at 126; *Rissman v. Rissman*, 213 F.3d 381, 383-85 (7th Cir. 2000). In the case at bar, plaintiffs claim that the nonreliance clauses in the SPAs and the TD Options agreement do not apply to the representations between defendant and plaintiffs, and so the clause should not factor into our decision.

Plaintiffs argue that section 6.7 of the SPA is inapplicable because defendant was not a "Party" to the agreement, nor was he a representative of a "Party." We disagree. The SPA defines GPZ Trading, LLC, and JSS Investments, LLC, as the "JV Parties" in their respective SPAs; the "JV Party" is included in the definition of "Party." The language of section 6.7 provides that there is no reliance on any statements made "by any Party or its directors, officers, employees or agents" other than what has been reduced to writing. Defendant was a "director, officer[], employee[] or agent[]" of both JSS and GPZ; in fact, defendant signed the SPA on behalf of JSS. Thus, representations made by defendant would fall under section 6.7. Plaintiffs attempt to argue that defendant made his representations not as a representative of TD, JSS, or GPZ, but as their representative who was negotiating on their behalf with TD. However, the language of the contractual provision is clear and we find that any representations made by

Nos. 1-09-1361, 1-09-3173 (Cons.)

defendant to plaintiffs would be covered under section 6.7 of the SPA.[3]

Defendant argues that we should consider the nonreliance clause in the case at bar as automatically defeating an allegation of justifiable reliance. In support of his argument, defendant relies on *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450. In *Tirapelli*, the plaintiffs brought suit against the defendants for common law fraud, as well as for violations of state securities laws, related to a purchase of shares in defendant Telecom Capital Group. *Tirapelli*, 351 Ill. App. 3d at 451. The plaintiffs alleged that the defendants made oral representations to them that were not included in their contract, and that they relied on these representations. *Tirapelli*, 351 Ill. App. 3d at 454. The contract in that case included a nonreliance clause, which provided:

> " 'In evaluating the suitability of an investment by the undersigned
> Company, the undersigned has relied solely upon the materials
> made available at the undersigned's request and independent
> investigations made by the undersigned in making the decision to
> purchase the Preferred Membership Interests subscribed for herein,
> and acknowledges that no representations or warranties (oral or
> written), have been made to the undersigned with respect thereto.'
> " *Tirapelli*, 351 Ill. App. 3d at 453.

The contract also included an integration clause. *Tirapelli*, 351 Ill. App. 3d at 453.

---

[3] Since we find that section 6.7 of the SPAs bars plaintiffs' affirmative fraud claim, we need not determine whether section 3.1(d)(viii) of the TD Options agreement does the same.

On appeal, we held that the nonreliance clause barred the plaintiffs from stating a cause of action for fraud, stating that "[h]aving agreed in writing that they did not rely on any representations found outside the subscription documents, plaintiffs cannot be allowed to argue fraud based on such representations." *Tirapelli*, 351 Ill. App. 3d at 457. We also noted that as sophisticated business people, plaintiffs could have negotiated for the inclusion of any representations that they thought were important. *Tirapelli*, 351 Ill. App. 3d at 457.

To reach the conclusion in *Tirapelli*, we relied on two cases, *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, and *Rissman v. Rissman*, 213 F.3d 381. In *Adler*, the plaintiffs brought suit against the defendant for, *inter alia*, common law and statutory fraud after they lost their investments in limited partnership interests in the defendant company. *Adler*, 271 Ill. App. 3d at 119. The plaintiffs argued that they relied on oral misrepresentations that differed from the written representations provided to them. *Adler*, 271 Ill. App. 3d at 124. The defendant filed a motion to dismiss the complaint for failure to state a cause of action, and the trial court dismissed plaintiffs' complaint. *Adler*, 271 Ill. App. 3d at 119-20.

We affirmed, based on nonreliance language present in the private placement memorandum (PPM) that was given to prospective investors. *Adler*, 271 Ill. App. 3d at 127. We noted that the plaintiffs were given PPMs that contained detailed information, including cautions that the investment carried a high degree of risk. *Adler*, 271 Ill. App. 3d at 126. The plaintiffs were also required to sign subscription agreements that warranted that they had read the PPM and made the decision to invest based solely on the PPM and not in reliance on any other information. *Adler*, 271 Ill. App. 3d at 126. We held that it was unreasonable for the plaintiffs to rely on oral

representations that were directly contrary to statements in the written agreement, reasoning that "[t]o accept the plaintiffs' contention is to hold the written agreement for naught." *Adler*, 271 Ill. App. 3d at 127.

Similarly, in *Rissman*, the Seventh Circuit upheld a grant of summary judgment in the defendant's favor where the plaintiff sold his shares in a business to his brother, the defendant. *Rissman*, 213 F.3d at 382. In that case, the plaintiff sold his shares of the family's business to the defendant for $17 million. *Rissman*, 213 F.3d at 382. During their negotiations, the plaintiff asked the defendant to include a representation in the contract that he would not sell the company; the defendant refused. *Rissman*, 213 F.3d at 383. The parties included a nonreliance provision in the contract, as well as a provision providing that if the company was sold, the plaintiff's payments would be accelerated. *Rissman*, 213 F.3d at 383. Slightly more than a year after the sale, the defendant sold the company for $335 million. *Rissman*, 231 F.3d at 382.

The Seventh Circuit held that the plaintiff could not establish reasonable reliance on the defendant's oral representations that he would not sell the company in part because of the presence of the nonreliance clause. *Rissman*, 231 F.3d at 383. The court held that "a written anti-reliance clause precludes any claim of deceit by prior representations." *Rissman*, 231 F.3d at 384. It reasoned that "[a] non-reliance clause is not identical to a truthful disclosure, but it has a similar function: it ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication." *Rissman*, 231 F.3d at 384. The court also noted that promoting the primacy of the written word was a goal of the federal securities laws. *Rissman*, 231 F.3d at 384. However, in

her concurrence, Judge Rovner cautioned that the court's holding did not set forth an automatic rule precluding damages for fraud based on oral representations in the presence of a nonreliance clause. *Rissman*, 231 F.3d at 389 (Rovner, J., concurring).

Our decision in *Tirapelli* established such an automatic rule, but the question of whether *Tirapelli* applies is not as clear as defendant claims. Since *Tirapelli* has been decided, there have been several federal district court cases applying its automatic rule, but there has only been one Illinois state case considering its holding. In *Bauer v. Giannis*, 359 Ill. App. 3d 897, 902-03 (2005), the Second District Appellate Court considered whether an "as-is" clause in a contract for the sale of a home prevented the buyer from reasonably relying on the seller's representations on a disclosure form that there had been no flooding in the house. The clause at issue stated that the buyer accepted the property " 'without any warranty or representation' " by the sellers. *Bauer*, 359 Ill. App. 3d at 904. The sellers claimed that the "as-is" clause was a disclaimer of reliance and attempted to analogize its case to *Tirapelli* and *Adler*. *Bauer*, 359 Ill. App. 3d at 903.

After analyzing *Tirapelli* and *Adler*, the *Bauer* court found that those cases were not applicable. *Bauer*, 359 Ill. App. 3d at 905. The court primarily focused on the fact that the two cases involved oral representations while the seller's alleged misrepresentation was located in a written disclosure required by law. *Bauer*, 359 Ill. App. 3d at 905. However, the court also placed significance on the fact that *Tirapelli* and *Adler* both involved securities transactions, and noted that "*Tirapelli* relied on special considerations relevant to securities transactions," which were not present in the case at hand. *Bauer*, 359 Ill. App. 3d at 905, 907.

In the case at bar, plaintiffs argue that the transaction was not a securities transaction and

so *Tirapelli* should not apply. They claim that the contract was for the sale of a business and that the stock was simply the contractual device through which the interests were transferred. However, the same argument could be made for the plaintiff in *Rissman*, who sold his share of the family business to the defendant by selling him stock. *Rissman*, 213 F.3d at 382. Here, plaintiffs were compensated through stock; the upfront payment was in Class A shares, which were then sold for cash, while the "back-end" payments were Class B-3 shares. Thus, the transaction was a securities transaction.

Plaintiffs also argue that we should not apply *Tirapelli* to the case at bar because that case concerned parties who were engaged in arm's length transactions; here, plaintiffs claim that defendant was not a counterparty but was representing plaintiffs in their negotiations with TD. However, plaintiffs' argument is not a basis for refusing to apply the nonreliance clause. The parties to the SPAs were TD, plaintiffs, Big Blue or Johnson, Inc., and GPZ or JSS. GPZ and JSS were joint venture partners with Big Blue and with Johnson, Inc., respectively. As joint venture partners, the entities would not have been strangers contracting at arm's length; despite this, the parties entered into the SPAs and included the nonreliance clause. Thus, the parties disavowed reliance in a situation that, from its very inception, would include parties who were not dealing at arm's length. The fact that it was allegedly plaintiffs and defendant, and not their entities, who were not dealing at arm's length does not invalidate the nonreliance clause. If plaintiffs had desired a different arrangement, they could have negotiated for it at the time the SPA was drafted. Plaintiffs were represented by attorneys at the time that they entered into the contract; indeed, the attorneys had successfully negotiated for the addition of a warranty that

defendant was not receiving any side consideration. Thus, we do not distinguish *Tirapelli* on the basis that the parties here chose to enter into a transaction that was not at arm's length.

Plaintiffs' final argument for not applying *Tirapelli* is that the clause was an exculpatory clause, which is void as against public policy. They argue that section 6.7 of the SPAs is an exculpatory clause that shields defendant from his intentional misconduct. Plaintiffs highlight the final sentence of the clause, which states that "there shall be no liability, either in tort or in contract, assessed in relation to any such warranty, representation, opinion, advice or assertion of fact, except to the extent contemplated above." We do not find section 6.7 to be against public policy.

The plaintiffs in *Tirapelli* made an argument that the nonreliance clause functioned as an exculpatory clause, which do not protect against intentional torts. *Tirapelli*, 351 Ill. App. 3d at 458. The *Tirapelli* court rejected the plaintiffs' arguments, noting that the cases cited by the plaintiffs did not involve sophisticated parties engaged in securities transactions and that *Rissman* and *Adler* were more applicable. *Tirapelli*, 351 Ill. App. 3d at 458. However, as plaintiffs point out, the clause in *Tirapelli* did not contain explicit exculpatory language as in this case.

Plaintiffs argue that *Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.*, 285 Ill. App. 3d 201 (1996), is more applicable to this case. In *Kleinwort*, the plaintiff entered into an agreement to purchase a subsidiary of the defendant's business. *Kleinwort*, 285 Ill. App. 3d at 203-04. As part of their agreement, the defendant represented to the plaintiff that it had a selling team that was experienced in the field of business in which the plaintiff wanted to expand. *Kleinwort*, 285 Ill. App. 3d at 205. During the course of the

transaction, members of the selling team left the company, until only one remained. *Kleinwort*, 285 Ill. App. 3d at 205. The defendant represented to plaintiff that the remaining member had not left the company, when in fact, he resigned the day of the closing. *Kleinwort*, 285 Ill. App. 3d at 206.

The plaintiff brought a number of claims against defendant, including a claim seeking rescission of the contract due to fraud in the inducement of the contract. *Kleinwort*, 285 Ill. App. 3d at 215. The defendant argued that rescission was not permitted because of a clause in the contract that limited remedies for fraud. *Kleinwort*, 285 Ill. App. 3d at 215. We held that the clause did not prevent rescission, because "exculpatory clauses for wilful and wanton conduct are void as a matter of public policy," which included the provision that limited the liability for fraud. *Kleinwort*, 285 Ill. App. 3d at 216.

We do not find that section 6.7 of the SPA contained such an exculpatory clause. The provision indicates that no party relied on any representation that was not contained in the written contract. If there was no reliance, then there can be no liability, regardless of whether the last sentence of the provision is present. The language of the provision merely makes explicit an already-present result of the nonreliance clause. We do not see it as analogous to *Kleinwort*, because in that case, the clause limited the remedy for an intentional tort that had occurred. See *Kleinwort*, 285 Ill. App. 3d at 215. Here, the fraud *cannot* occur, because the parties have agreed that there was no reliance, a necessary element for fraud. Thus, the clause targets reliance, not a release from liability for intentional torts, which would be void. See *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 164 (1986) ("An exculpatory clause cannot protect

37

persons from the results of their wilful and wanton misconduct.").

Moreover, we do not find the clause in the case at bar similar to any of plaintiffs' other cited cases. In *Time Warner Sports Merchandising v. Chicagoland Processing Corp.*, 974 F. Supp. 1163, 1174 (N.D. Ill. 1997), the exculpatory clause stated that defendant would not " 'incur any financial responsibility or liability of any kind or nature whatsoever in connection with or arising out of this Agreement, express or implied, written or oral.' " Like in *Kleinwort*, the clause in *Time Warner* denies liability for a tort that had occurred; it does not concern whether a cause of action for the tort can be established at all.

Plaintiff claims that the clause at issue in *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d at 159, contains a nonreliance provision similar to that in the case at bar. The clause in *Zimmerman* did contain a statement that " 'neither the Seller, broker nor any of their agents have made any representations with respect to any material fact *** unless such representations are in writing,' " and the court in that case nevertheless held that the exculpatory clause was invalid. *Zimmerman*, 156 Ill. App. 3d at 159. The court reasoned: "An exculpatory clause cannot protect persons from the results of their wilful and wanton conduct. [Citations.] Such a contractual shield is illegal. [Citation.] We have found that count I sufficiently states a cause of action for fraud, which is an intentional tort. Thus, the exculpatory clause in the present case would not shield defendants from liability for fraud." *Zimmerman*, 156 Ill. App. 3d at 164-65. However, the clause in *Zimmerman* did not contain the additional nonreliance language present in the case at bar. Thus, here, plaintiffs would not have been able to state a claim for affirmative fraud since they would have been unable to prove the element of justified reliance, making

Nos. 1-09-1361, 1-09-3173 (Cons.)

*Zimmerman* inapplicable.

As a final matter, we note that the non-reliance clause in the case at bar only applies to a "warranty, representation, opinion, advice or assertion of fact," indicating that it encompasses affirmative fraud and not fraudulent concealment, which concerns silence in the face of a duty to speak. The trial court found that count II of plaintiffs' complaint stated a cause of action, to the extent that it contained a fraudulent concealment claim; defendant does not challenge this finding on appeal. Thus, this is another way to distinguish *Zimmerman*, where the cause of action for fraud was largely based on fraudulent concealment, which would have been encompassed by the exculpatory clause. See *Zimmerman*, 156 Ill. App. 3d at 162.

In the case at bar, where there were sophisticated parties to a securities transaction, and in the presence of a non-reliance clause, we will follow *Tirapelli* and find that plaintiffs cannot state a claim for affirmative fraud because they cannot show reasonable reliance on defendant's oral representations as a matter of law due to the non-reliance clause in section 6.7 of the SPAs.

*Sanctions*

Finally, after the trial court granted defendant's motion for summary judgment, defendant sought the imposition of sanctions pursuant to Rule 137. The trial court denied his motion and defendant appeals that decision.

Illinois Supreme Court Rule 137 allows the trial court to award sanctions against parties who filed frivolous pleadings when a pleading has no basis in fact or law. Ill. S. Ct. R. 137 (eff. Feb. 1, 1994). An attorney's signature on a pleading, motion or other paper indicates "that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded

in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose." Ill. S. Ct. R. 137 (eff. Feb. 1, 1994). "Rule 137 is intended to prevent counsel from making assertions of fact or law without support ***." *Lewy v. Koeckritz International, Inc.*, 211 Ill. App. 3d 330, 334 (1991).

In order to avoid sanctions, parties must present objectively reasonable arguments for their view, regardless of whether they are found to be correct. *Shea, Rogal & Associates, Ltd. v. Leslie Volkswagen, Inc.*, 250 Ill. App. 3d 149, 154 (1993). In determining whether sanctions are warranted in a particular case, the court must ascertain what was reasonable at the time, and should not engage in hindsight. *Lewy*, 211 Ill. App. 3d at 334. The determination of whether to impose sanctions under Rule 137 rests with the sound discretion of the trial court; the decision to impose or deny sanctions is entitled to great weight on appeal and will not be disturbed on review absent an abuse of discretion. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 487 (1998). "A circuit court exceeds its discretion only where no reasonable person would take the view adopted by it." *Spiegel v. Hollywood Towers Condominium Ass'n*, 283 Ill. App. 3d 992, 1001 (1996) (citing *Lewy*, 211 Ill. App. 3d at 334-35). " 'When reviewing a decision on a motion for sanctions, the primary consideration is whether the trial court's decision was informed, based on valid reasoning, and follows logically from the facts.' " *Sterdjevich v. RMK Management Corp.*, 343 Ill. App. 3d 1, 19 (2003) (quoting *Technology Innovation Center, Inc. v. Advanced Multiuser Technologies Corp.*, 315 Ill. App. 3d 238, 244 (2000)).

In the case at bar, the trial court determined that defendant's motion for sanctions should

be denied because plaintiffs' claims "could arguably have been well-grounded and warranted by existing law or by -- and I'm highlighting this -- a good-faith argument for the extension, modification, or reversal of existing law." We cannot find that the trial court's denial of sanctions was an abuse of discretion.

While the trial court found as a matter of law that plaintiffs were not in a fiduciary relationship with defendant, and we agree, the fact that plaintiffs failed in the underlying dispute does not necessarily mean that their suit was sanctionable. See *Baker v. Daniel S. Berger, Ltd.*, 323 Ill. App. 3d 956, 969 (2001) (acknowledging that "the purpose of Rule 137 is not to penalize litigants because they were unsuccessful"). Additionally, a grant of summary judgment is not inconsistent with a refusal to impose sanctions. See, *e.g.*, *Yunker v. Farmers Automobile Management Corp.*, No. 3-09-0417, slip. op. at 11-12 (Ill. App. Sept. 10, 2010); *Burrows v. Pick*, 306 Ill. App. 3d 1048, 1055 (1999); *O'Brien & Associates, P.C. v. Tim Thompson, Inc.*, 274 Ill. App. 3d 472, 483 (1995).

Defendant argues that sanctionable conduct occurred at numerous points throughout the litigation. Defendant first argues that plaintiffs' claims in their fourth amended complaint were not well grounded in fact or warranted by law. The bulk of defendant's argument consists of his characterization of plaintiffs' factual assertions as "lies." For instance, defendant claims that "[p]laintiffs knew from their own involvement in the transactions underlying this case that their claim that they placed their complete trust in [defendant] regarding the TD transaction and that they were dominated and controlled by him was a sham," and that "[p]laintiffs*** knew full well that their allegations were not well-founded." There is no evidence to support such an

accusation.

Plaintiffs set forth a number of allegations in their complaint to establish trust and dominance. While those allegations were not sufficient to establish a fiduciary in fact relationship, there is no evidence that the facts alleged were untrue. At most, defendant presented evidence rebutting the facts alleged by plaintiffs; however, we cannot find that the trial court erred in denying an award of sanctions on that basis.

Furthermore, defendant argues that plaintiffs should be sanctioned because "the undisputed facts of their case totally failed to satisfy the legal principles on which they relied." However, the law on the establishment of a fiduciary in fact relationship is not as unambiguously settled as defendant claims, and plaintiffs were entitled to argue that their situation fit within the parameters of fiduciary law. Plaintiffs distinguished defendant's cases, and attempted to fit the facts of their case within *Kulp*, an Illinois Supreme Court case. Thus, we cannot find that the trial court's determination that plaintiffs' claims were not sanctionable to be an abuse of discretion.

Moreover, we find defendant's argument that the shifting theories of the case in the various complaints filed demonstrate that plaintiffs' claims were sanctionable to be unpersuasive. All of the complaints were filed before the trial court, and the trial judge had the opportunity to consider them, and the behavior of the parties, when determining whether sanctions were appropriate. We cannot find that the trial court abused its discretion by not awarding sanctions on that basis.

Similarly, we cannot find that the oral statements and discovery responses pointed to by defendant support a finding that the trial court abused its discretion by denying sanctions.

42

Defendant points to plaintiffs' statements that Sachnoff had no involvement in negotiating the price of the Big Blue DPM and argues that the Sachnoff documents prove otherwise; defendant similarly claims that plaintiffs should have disclosed that the Sachnoff attorneys were consulted regarding the sale. However, the Sachnoff attorneys disputed defendant's characterization of those documents, as did plaintiffs. Finally, defendant argues that several of plaintiffs' oral representations before the trial court were sanctionable. Again, the trial court was present during the entire procedure of this case, and was able to consider whether plaintiffs' representations demonstrated sanctionable conduct, and we do not find the determination that they did not to be an abuse of discretion.

Defendant's final argument for sanctions is that plaintiffs' attorneys should be sanctioned for failing to withdraw their complaint after his counsel contacted plaintiffs' counsel to inform them that their claims were without a factual or legal basis. However, because we have found the trial court's decision denying sanctions not to be an abuse of discretion, we will not find plaintiffs' failure to withdraw to have constituted sanctionable conduct.

## CONCLUSION

We find that the trial court did not err in granting summary judgment in defendant's favor on plaintiffs' claims for breach of fiduciary duty and fraudulent concealment. We also find that plaintiffs' claim for affirmative fraud was barred by the nonreliance clause in their contracts and affirm the trial court's decision on that point. Finally, we find that the trial court did not abuse its discretion by denying defendant sanctions.

We affirm.