# Illinois Official Reports

## Appellate Court

*Retirement Plan for Chicago Transit Authority Employees v. Chicago Transit Authority*, 2020 IL App (1st) 182510

| | |
|---|---|
| Appellate Court Caption | RETIREMENT PLAN FOR CHICAGO TRANSIT AUTHORITY EMPLOYEES, Plaintiff-Appellant, v. THE CHICAGO TRANSIT AUTHORITY, Defendant-Appellee. |
| District & No. | First District, First Division<br>No. 1-18-2510 |
| Filed | March 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CH-14414; the Hon. David B. Atkins, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James L. Kopecky and Daryl M. Schumacher, of Kopecky Schumacher Rosenburg LLC, of Chicago, for appellant.<br><br>Karen G. Seimetz, Corporation Counsel (Stephen L. Wood and Irina Y. Dmitrieva, Assistant Corporation Counsel, of counsel), and John Kennedy and Allison Czerniak, of Taft Stettinius & Hollister LLP, both of Chicago, for appellee. |

Panel                    JUSTICE HYMAN delivered the judgment of the court, with opinion.
                         Presiding Justice Griffin and Justice Walker concurred in the judgment
                         and opinion.


# OPINION

¶ 1     This dispute involves prescription drug rebates. The Retirement Plan for Chicago Transit Authority Employees (RP), a pension fund, manages retirement benefits, including health care and prescription drug benefits, for Chicago Transit Authority (CTA) retirees and their dependents. RP and the CTA agreed that RP would pay the CTA for the "actual cost" of retirees' prescription drugs. RP contends the CTA breached that agreement by retaining rebates the CTA received from its prescription drug provider, Caremark. RP asserts the rebates depended on the number of prescription drugs purchased and seeks the rebates associated with its retirees' prescription drug purchases. RP brought claims for an accounting, breach of contract, breach of the Illinois Pension Code, and breach of fiduciary duty.

¶ 2     The trial court granted partial summary judgment to the CTA, finding the breach of contract claims barred by the statute of limitations and the voluntary payment doctrine. After a bench trial, the trial court ruled in favor of the CTA on the remaining counts, finding RP failed to present clear and convincing evidence it had a fiduciary relationship with the CTA. RP contends the trial court erred in (i) determining when the statute of limitations actually began, (ii) applying the voluntary payment doctrine to its breach of contract claims, and (iii) finding RP and the CTA did not have a fiduciary relationship.

¶ 3     We affirm. The trial court properly granted summary judgment on RP's contract claims based on the statute of limitations and its finding that the parties did not have a fiduciary relationship was not against the manifest weight of the evidence. Under the discovery rule, the statute of limitations began to run when RP learned it had not been credited for the rebates; claims accrued more than five years before RP filed its complaint (June 13, 2013) are barred. Further, RP failed to show that the CTA was acting as its agent in negotiating with Caremark or had sufficient dominance over it to create a fiduciary relationship.


¶ 4                              BACKGROUND

¶ 5     In 1949, a Retirement Plan Agreement (Agreement) between the CTA and various labor unions formed RP to manage retired employees' retirement benefits, including health care benefits. (A separate agreement between the CTA and the unions covers current employees' health care benefits.) Staffed by 13 to 15 employees (many on leave from the CTA), The Retirement Allowance Committee (RAC) administered RP. It consists of 10 members—5 appointed by the CTA and 5 by the CTA employee's union. John Kallianis, a CTA employee, has served as RP's executive director since 2000. Kallianis supervised all RP's "routine matters in connection with the administration," including managing staff, reviewing and paying invoices, setting the agenda, and preparing materials for the monthly RAC meetings.

¶ 6     Under the Agreement, the CTA provided health care, including prescription drugs, to CTA retirees and their dependents. The CTA administered the retiree health benefit, which involved organizing the open enrollment process, providing customer service and claims management services, and contracting with prescription drug suppliers, like Walgreens and Caremark.

¶ 7         Before 2003, the CTA used a "balance billing" system, invoicing RP monthly for the estimated costs of retirees' health care. A 2002 audit revealed a $42 million shortfall for the health costs retirees incurred the previous seven years, and RP reimbursed the CTA the full amount. To avoid another shortfall, RP and the CTA agreed that the CTA would invoice RP for retirees' "actual" cost of health care, including prescription drugs. Though not formalized in writing, this change in the CTA's billing method was noted in the minutes of the RAC's January 22, 2003, meeting. The CTA used this billing method from February 2003 until mid-2009.

¶ 8         In 2003, the CTA, in coordination with six other local government agencies, including the City of Chicago, the Chicago Park District, and the Chicago Housing Authority, accepted bids for a new pharmacy benefits manager. The coalition selected Caremark, and each agency negotiated its own contract. RP did not participate in the bidding process or the contract negotiations. Also, RP was not a party to the CTA's contract with Caremark.

¶ 9         The availability of rebates for prescription drugs emerged as an important factor in selecting Caremark. Under the contract, Caremark agreed to issue rebates to the CTA under certain conditions. The amount of the rebates depended on the price, volume, and method of dispensing drugs, as well as the way the CTA designed its prescription drug plan. If the CTA met the requirements, it qualified for higher, "three-tier structure" rebates; otherwise, it received a lower rebate under a different "two-tier" structure. Caremark agreed "to issue all rebates and other amounts due and owning the Client." The contract also provided that "for purposes of the Federal Anti-Kickback Statute, these client credits "shall constitute and shall be treated as discounts against the price of drugs within the meaning of 42 U.S.C. 1320a 7b(b)(3)(A)."

¶ 10        Three years later, in November 2006, an RAC member asked Kallianis a question, and Kallianis sent an e-mail to the CTA's benefits manager, Larry Wall, inquiring if the CTA was paying RP a share of the prescription drug rebates it received from Caremark. Wall told Kallianis he would get back to him with information about the rebates. On February 8, 2007, Kallianis sent a follow-up to Wall stating, "I had initially asked you about Caremark rebates available to the Retirement Plan last November. *** At that time, you had indicated that there were rebates available from Caremark and that you were still trying to figure out how the rebates would be credited to the Plan." Kallianis also asked Wall to provide "a written description of how the Caremark rebate program works, what rebates the Retirement Plan is entitled to, and when we will receive our portion of the rebate."

¶ 11        In 2008, the Illinois legislature replaced the RAC with the Retirement Healthcare Trust. In July 2009, this trust took over responsibility for providing health care benefits to retirees and their beneficiaries. During the transition, RP retained a firm to audit its health care and prescription drug payments. The auditors inquired about how the Caremark rebate program worked. Wall responded by letter on August 25, 2009, stating that "historically, CTA has not provided any portion of [the prescription drug] rebates to the Plan and the Plan has never requested any portion of the rebates."

¶ 12        After receiving a copy of Wall's letter, Kallianis wrote Wall on August 28, 2009, asking him "to immediately provide the data on all rebates the CTA had received on prescription drugs related to the retiree prescriptions going back to January 2003." He further stated, "I am assuming that the Trustees will want to pursue reimbursement for the amount of prescription drug rebates that have been received by the CTA related to retiree prescriptions."

¶ 13     Wall wrote back on October 23, 2009, informing Kallianis that an estimated 69% of prescription drugs covered by Caremark's contract with the CTA had been provided to retirees, and that, since 2004, Caremark had paid the CTA about $7.3 million in rebates attributable to retirees' prescription drugs. Wall further stated that if RP claimed a share of the Caremark rebates, the CTA would seek recovery of "administrative costs" from RP. Wall stated the CTA had not previously asked RP for reimbursement because the rebates partially offset its administrative costs.

¶ 14     Believing it was entitled to a portion of the Caremark rebates, RP filed its initial complaint against the CTA on June 10, 2013. In its second amended complaint, RP asserted claims for (i) an accounting (count I), (ii) breach of express contract, (iii) breach of implied contract in fact (pled in the alternative to count II), (iv) unjust enrichment (count IV) (pled in the alternative to counts II and III), (v) prohibited transaction in violation of the Illinois Pension Code (40 ILCS 5/1-110(a)(4), (b)(1) (West 2012)) (counts V and VI), and (vi) breach of fiduciary duty (count VII).

¶ 15     The CTA asserted several affirmative defenses, including the statute of limitations. The CTA counterclaimed to recover administrative costs it incurred in handling the health care claims for retirees and their dependents under theories of unjust enrichment and *quantum meruit*.

¶ 16                                    Summary Judgment

¶ 17     The CTA moved for summary judgment on all counts. After a hearing, the trial court held that all RP's claims that accrued more than five years before filing its complaint, that is, before June 13, 2008, were barred. Applying the discovery rule, the court found that RP knew or should have known that rebates had been credited toward its remittances and, at the latest, should have known as of February 8, 2007, the date Kallianis e-mailed Wall about the rebates. "[T]hat is the moment where Kallianis had sufficient information that would allow him to inquire as to whether the Retirement Plan had sustained an actionable injury."

¶ 18     The court also granted summary judgment based on the voluntary payment doctrine for RP's claims of breach of express contract, breach of contract implied in fact, and unjust enrichment. The court held that after learning of the existence of the rebates on or before February 8, 2007, "the Retirement Plan continued to pay [the CTA's] invoices in full [and] continued to authorize payment of each health care invoice received by the Retirement Plan from [the] CTA." The court rejected RP's argument that the payments were a mistake of fact or that a genuine issue of material fact existed as to whether the voluntary payment doctrine applied. Kallianis had testified at his deposition that he believed the CTA would remit part of the rebates to RP but could not recall anyone from the CTA telling him RP would be credited. The court found Kallianis's "expectation" of future reimbursement did not constitute a mistake of fact sufficient to avoid application of the voluntary payment doctrine.

¶ 19     The court denied the CTA's motion for summary judgment on RP's allegations of prohibited transaction in violation of the Illinois Pension Code and breach of fiduciary duty, finding a material issue of fact existed as to whether the relationship between the CTA and RP was fiduciary in nature and, therefore, whether the CTA owed RP a fiduciary duty.

¶ 20                                                     The Trial

¶ 21    A four day bench trial proceeded on the remaining claims—accounting, prohibited transactions under the Pension Code, and breach of fiduciary duty—all of which rested on whether RP showed, by clear and convincing evidence, that it had a fiduciary relationship with the CTA.

¶ 22    Kallianis, testifying about his duties as executive director, stated that he manages 13 to 15 employees and RP has an operating budget of about $5 million. RP hired an independent investment advisor to manage its $1.7 billion in assets and a law firm to handle legal matters. Kallianis has a Master of Business Administration (MBA) in finance, worked as an assistant commissioner for two city of Chicago departments, and served as chief of staff to the CTA president. Kallianis was on leave from the CTA, did not report to anyone at the CTA, and his sole loyalty belonged to RP. He would have reported attempts by the CTA to interfere with his duties to RAC.

¶ 23    Kallianis acknowledged RP was not a party to either the negotiations or contract with Caremark, and RP had no legal obligations under the contract. Kallianis believed the rebates were a discount on the drugs and should have been remitted to RP to reduce "the actual costs" of prescription drug coverage the CTA charged RP. Not until October 2009 did Wall tell him the rebates offset administrative costs.

¶ 24    RP also presented a CTA auditor who performed the audit that uncovered the $42 million shortfall in 2003. He testified that if he had known that the CTA was receiving rebates, he would have deducted them from the amount RP paid to the CTA.

¶ 25    Larry Wall, former CTA benefits manager, testified that the rebates constitute an asset of the CTA, as part of the contract they had negotiated with Caremark to lower the cost of administering the health care program. He denied telling Kallianis the rebates would be credited to RP, saying he had no authority to make that decision and would never have said that.

¶ 26    A former CTA chief financial officer testified that rebates are an industry norm and, in his experience, rebates do not get passed on to pension funds. A former CTA comptroller testified that the amount of the rebate was not directly correlated to the number of prescription drugs purchased. Caremark used multiple factors in its formula for calculating rebates. She opined that RP had no entitlement to the rebates because rates lowered the CTA's administrative costs and functioned as a key factor in obtaining more favorable prescription drug rates than RP could have otherwise obtained.

¶ 27    After trial, the court entered judgment against RP on the complaint and against the CTA on its counterclaims. The court ruled that RP failed to show by clear and convincing evidence a fiduciary relationship with the CTA, a requirement to prove its claims. Also, RP was a sophisticated entity headed by an independent executive director whose sole loyalty was to RP and "was staffed by over a dozen experienced individuals and capable of handling its own business (a significant factor on the presence of a fiduciary relationship)."

¶ 28    The court noted that several CTA employees testified that the rebates offset the CTA's administrative costs in managing the program for its employees and retirees. "This understanding was further supported by testimony that the CTA only asserted its claim for such administrative costs after the Plan asserted its claim for the rebates." The court referred to Kallianis's testimony that he believed the rebates should go to RP as a discount on the actual

cost of drugs but found that "his unilateral expectation is not compelling evidence of a fiduciary relationship, nor does it show that Rebates were ever a Plan asset."

¶ 29 The court also concluded that the mechanics of the Caremark contract supported the CTA's interpretation. Namely, the contract stated that the rebates would go to the CTA not RP, the rebates were paid quarterly while the actual cost invoices were billed monthly, and the rebates were calculated based on the total number of CTA employees (active and retired) and not on retirees' purchases only. "These facets of the Caremark contract suggest that the Rebates were a general contracting incentive to the CTA, not a direct discount on the price of drugs." Moreover, RP had not been involved in negotiating or administering the contract and only acted as a third party with a separate relationship to the CTA. "The only trust the Plan apparently placed in the CTA was that of all contractually bound parties: to properly carry out its end of the business (in this case regularly billing for the costs of the CTA retirees' prescription drugs)."

¶ 30 RP appealed from the trial court's summary judgment order on its breach of contract and unjust enrichment claims and its judgment for the CTA on the remaining claims. The CTA did not appeal the court's judgment on its counterclaims.

¶ 31                                                    ANALYSIS
¶ 32                                              Standard of Review
¶ 33 We review a trial court's grant of summary judgment *de novo*. *Argonaut Midwest Insurance Co. v. Morales*, 2014 IL App (1st) 130745, ¶ 14. For summary judgment, the movant must show that no triable issue of material fact exists, and entitlement to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). Genuine issues of material fact involve disputed material facts or, if undisputed, that reasonable persons might draw different inferences from those facts. *Id.*

¶ 34 Unless against the manifest weight of the evidence, a trial court's judgment after a bench trial will be affirmed. *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 25. "[A]gainst the manifest weight of the evidence" means that, based on the record, the judgment is arbitrary, unreasonable, not based on evidence, or the opposite conclusion is apparent. *Munson v. Rinke*, 395 Ill. App. 3d 789, 795 (2009). "[W]e may affirm the judgment of the trial court on any basis in the record, regardless of whether the trial court relied upon that basis or whether the trial court's reasoning was correct." *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 734 (2009). We may not overturn a judgment because we disagree with it or that, as the trier of fact, we might have arrived at a different result. *Eychaner v. Gross*, 202 Ill. 2d 228, 271 (2002).

¶ 35                          Breach of Contract and Unjust Enrichment Claims
¶ 36 RP brought two claims for breach of contract and one claim of unjust enrichment. Those claims depended on RP's contention that by withholding rebates, the CTA breached its agreement to bill RP for the "actual" cost of prescription drugs. As a preliminary matter, the CTA contends that, at trial, the court rejected the premise of those claims, finding RP failed to prove the rebates were a discount on the price of drugs. The CTA asserts this finding defeats RP's claims for breach of contract and unjust enrichment and, thus, we need not consider whether the court erred in granting summary judgment on these three claims. We disagree.

¶ 37    The trial court said the facts "suggest" the rebates were a "general contracting incentive to the CTA, not a direct discount on the price of drugs." It did not make a finding of fact. Thus, we will address whether the trial court erred in granting summary judgment on those claims under the statute of limitations and the voluntary payment doctrine.

¶ 38                                         *Statute of Limitations*

¶ 39    The parties agree that all of RP's claims must come within a five-year statute of limitations but disagree about when the statute of limitations began.

¶ 40    An action for breach of contract accrues when the breach of the contractual duty or obligation occurs, not when the party sustains damages. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 77 (1995). "Where a money obligation is payable in installments, a separate cause of action accrues on, and the statute of limitations begins to run against, each installment as it becomes due." *In re Marriage of Kramer*, 253 Ill. App. 3d 923, 928 (1993) (citing *Light v. Light*, 12 Ill. 2d 502, 506 (1957), and *Thread & Gage Co. v. Kucinski*, 116 Ill. App. 3d 178, 184 (1983) ("separate cause of action arises on each installment and the statute of limitations begins to run against each installment as it becomes due")).

¶ 41    The discovery rule provides an equitable exception that tolls the statute of limitations until the plaintiff discovers, or has reason to discover, the cause of action. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407 (1981). The plaintiff must then inquire further to determine whether an actionable wrong was committed. *Hermitage Corp.*, 166 Ill. 2d at 86 (citing *Nolan v. v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 170-71 (1981)). " 'In that way, an injured person is not held to a standard of knowing the inherently unknowable [citation], yet once it reasonably appears that an injury was wrongfully caused, the party may not slumber on his rights.' " *Id.* (quoting *Nolan*, 85 Ill. 2d at 170-71).

¶ 42    RP concedes it knew about the rebates as of February 8, 2007, when Kallianis inquired about them in an e-mail to Wall. RP asserts, however, that in addressing when the statute of limitations began, the trial court improperly framed the question as when RP knew the rebates were not *being* credited—February 8, 2007—when it should have looked to the date RP knew the rebates *were not going* to be credited—August 2009. That's when Wall informed Kallianis that the CTA would not remit any portion of the rebates to RP and would offset administrative costs if RP sought a share of the rebates. RP contends that because of the trial court's improper framing, it implicitly found the contract breached when the CTA received a rebate check and failed to remit any portion of it to RP.

¶ 43    Alternatively, RP contends that because the Retirement Plan Agreement does not mention the Caremark rebates (which did not exist at the time of the Agreement), a question of fact persists as to what the parties would have agreed to had they known about the rebates. *Pel-Aire Builders, Inc. v. Jimenez*, 30 Ill. App. 3d 270, 274 (1975) (holding, when contract silent as to time of performance, law implies reasonable time, which presents question of fact). RP states that this question also raises a question of fact as to when the agreement was breached, which made summary judgment improper.

¶ 44    We disagree. The parties agreed that RP would pay the CTA the "actual" costs of retirees' prescription drugs. If, as RP contends, the amount of the rebates directly relates to the amount of retirees' prescription drug purchases, then the purported breach of contract occurred when the CTA received a rebate check and failed to credit RP. At that time, the CTA was charging RP for more than the actual costs of prescription drugs. Under the discovery rule, the statute

of limitations began when Wall confirmed the existence of the rebates in an e-mail to Kallianis on February 8, 2007.

¶ 45 Kallianis acknowledged he knew by February 2007 that the CTA received rebates and had not credited them to RP. Further inquiries to determine whether an actionable wrong was committed rests with RP alone. *Hermitage Corp.*, 166 Ill. 2d at 86. RP did not make further inquiries until August 2009, however, when, in response to a letter sent to RP's auditor, Kallianis asked Wall for information about the rebates and informed him RP would likely seek reimbursement.

¶ 46 We disagree with RP that the statute of limitation should not have started running until it knew the rebates were not *going to be* credited rather than when they were not *being* credited. This conflicts with the stated purpose of the parties' decision to switch billing methods—to ensure that RP paid the actual cost of prescription drugs and avoid another later reconciliation, as occurred when RP owed the CTA $42 million. Moreover, this argument relies on what Kallianis believed was going to happen. But the record fails to support RP's assertion that Kallianis' belief was reasonable. Wall denied ever telling Kallianis that the CTA would credit RP for the rebate amounts; Kallianis testified at his deposition that he could not recall anyone telling him RP would be credited. Kallianis' subjective belief about a later reconciliation does not toll the statute of limitations.

¶ 47 We affirm the trial court's finding that the statute of limitations commenced on February 8, 2007, when Kallianis learned that RP was not receiving rebates.

¶ 48 Because the statute of limitations applies to RP's contract claims, we need not address whether those claims would be barred by the voluntary payment doctrine.

¶ 49 Fiduciary Relationship

¶ 50 RP contends the trial court's finding that the CTA and RP did not have a fiduciary relationship was against the manifest weight of the evidence and should be reversed and remanded for a trial on the merits.

¶ 51 As a preliminary matter, the CTA contends RP has violated Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) and waived this argument by failing to cite evidence in the record to support its assertion of a fiduciary relationship. Rule 341(h)(7) requires the appellant's brief to support its argument with citation of the authorities and the pages of the record. Reviewing courts may dismiss an appeal or waive arguments where the appellant's brief fails to comply with supreme court rules on briefing. *Lozman v. Putnam*, 379 Ill. App. 3d 807, 823 (2008); *Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005). But, Rule 341 admonishes the parties and does not limit this court's jurisdiction. RP's brief is not so deficient as to prevent our review, and so we proceed.

¶ 52 RP contends it had a fiduciary relationship with the CTA because (i) the CTA was acting as RP's agent in negotiating the contract with Caremark and (ii) RP relied on the CTA in administering the prescription drug program for its retirees and beneficiaries. RP argues the CTA breached that duty by (i) negotiating terms of the Caremark contract that allowed the CTA to keep all the rebates or (ii) failing to give RP its proportionate share of the rebates. Neither argument persuades us.

An agency involves " 'a consensual, fiduciary relationship between two legal entities' " whereby " 'the principal has the right to control the conduct of the agent, and the agent has the power to effect the legal relations of the principal.' " *State Security Insurance Co. v. Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 595 (1994) (quoting *Gunther v. Commonwealth Edison Co.*, 126 Ill. App. 3d 595, 598 (1984)). Once an agency relationship has been established, a fiduciary relationship arises as a matter of law. *Id.* The usual tests of agency ask whether the principal has authority to control the method or manner of accomplishing a task by the agent, and whether the agent has authority to subject the principal to liability. *Wargel v. First National Bank of Harrisburg*, 121 Ill. App. 3d 730, 736 (1984).

The facts do not support RP's argument that the CTA acted as its agent in negotiating the Caremark contract. As the trial court stated and RP acknowledges, RP played no role in the procurement or negotiation of the Caremark contract and had no authority "to control the method or manner" in which the CTA came to an agreement with Caremark. Nor was RP legally bound by the contract's terms; RP was not liable under the contract to Caremark or any other third party, and, under the contract, the CTA had no authority to make RP liable. RP did not place any trust in the CTA to negotiate on its behalf, particularly regarding the rebates, which several witnesses testified were meant to offset administrative costs. In short, the indicia of an agency relationship in the CTA's contract with Caremark do not exist.

Thus, the trial court's finding that the parties did not have a fiduciary relationship because the CTA was not acting as RP's agent in negotiating the Caremark contract was not against the manifest weight of the evidence.

*The Parties' Relationship*

The record also does not support a finding that the relationship between RP and the CTA was fiduciary in nature. To determine whether a fiduciary relationship exists, courts look at several factors including (i) the degree of kinship between the parties, (ii) the disparity in business experience between the parties, and (iii) the extent to which the servient party entrusted the handling of its business to the dominant party and placed its trust and confidence in it. *Ransom v. A.B. Dick Co.*, 289 Ill. App. 3d 663, 673 (1997). "Generally, where parties capable of handling their business affairs deal with each other at arm's length, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged servient party, no fiduciary relationship will be deemed to exist." *State Security*, 258 Ill. App. 3d at 597-98 (citing *De Witt County Public Building Comm'n v. County of De Witt*, 128 Ill. App. 3d 11, 26 (1984)).

Merely because the parties have engaged in business transactions or have a contractual relationship does not initiate a fiduciary relationship. *Id.* at 597. Nor does one party trusting another party. *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 21 (1995). Rather, "[t]he essence of a fiduciary relationship is that one party is dominated by the other. *** Indeed, in the absence of dominance and influence there is no fiduciary relationship regardless of the level of trust between the parties." *Id.*

The evidence shows, as the trial court found, RP to be a sophisticated entity headed by an independent, experienced executive director. Kallianis has an MBA in finance and extensive experience working for the City of Chicago and the CTA. Despite continuing to work for the CTA, his sole loyalty was to RP, and RP did not rely on the CTA to handle its business. RP

had a staff of over a dozen "experienced individuals" overseen by the RAC, which met monthly and voted on whether to approve payment of the CTA invoices after review by Kallianis and another employee. Further, RP hired an investment advisor to manage its $1.7 billion in assets, retained an auditing firm to conduct audits of its expenses and finances, and hired an independent outside counsel, who attended the monthly RAC meetings.

¶ 61    RP relied on the CTA's contract with Caremark, as that was how retirees got their prescription drugs. But, absent dominance or control by one party, reliance alone does not create a fiduciary relationship. For instance, in *Benson v. Stafford*, 407 Ill. App. 3d 902 (2010), the plaintiff and defendants entered into a joint venture, and the plaintiffs relied on defendants to negotiate a sale of interests in the joint venture to a bank. When plaintiffs were unhappy with the sale, they sued defendant claiming defendant acted as their agent in negotiating with the bank and breached his fiduciary duty. *Id.* at 906-10. In support of their claim, the plaintiffs argued that defendant had a "very substantially superior" level of business experience, which, when combined with defendant's promise to negotiate for them, led the plaintiffs to trust defendant and placed defendant in a position of superiority and control. *Id.* at 913.

¶ 62    The trial court granted summary judgment to the defendant. The appellate court affirmed, finding the facts did not support the plaintiffs' contention that they trusted the defendant to negotiate for them, noting that they hired legal counsel to advise them about the deal. *Id.* at 914. Moreover, even if the plaintiffs provided enough evidence to show they trusted the defendant, that was not enough to form a fiduciary relationship. *Id.* " '[N]ormal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship.' " (Internal quotation marks omitted.) *Id.* (quoting *Gary-Wheaton Bank v. Burt*, 104 Ill. App. 3d 767, 774 (1982)).

¶ 63    The "essence" of a fiduciary relationship is dominance of one party by the other, and the court found the plaintiffs could not prove dominance by the defendants based on their comparative levels of experience. *Id.*

¶ 64    Similarly, RP trusted the CTA to enter a contract that would permit RP to provide prescription drug benefits to CTA retirees. That trust did not give rise to a relationship fiduciary in nature. The parties merely had a contractual relationship; nothing in the record demonstrates the CTA dominated RP. Rather, RP was a separate entity, managed itself, and established its own decision-making structure. Thus, the trial court's finding no fiduciary relationship between RP and the CTA was not against the manifest weight of the evidence.

¶ 65    Affirmed.