2020 IL App (2d) 191089-U
No. 2-19-1089
Order filed November 10, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ALEX NOBLE, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-AR-388 |
| | ) | |
| J & K PROPERTIES, INC., d/b/a Chuggers | ) | |
| Sports Bar & Motel, | ) | Honorable |
| | ) | Donna R. Honzel, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Justices Hudson and Brennan concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's ruling, that defendant breached its contract with plaintiff, was not against the manifest weight of the evidence. Therefore, we affirm.

¶ 2     Plaintiff, Alex Noble, brought a breach of contract action against J&K Properties, Inc., d/b/a Chuggers Sports Bar & Motel (defendant). Following a bench trial, the trial court ruled in plaintiff's favor, and defendant argues that the ruling was against the manifest weight of the evidence. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4     Plaintiff filed his complaint against defendant on December 4, 2017, alleging as follows.

In 2011, plaintiff purchased 50 shares of stock in defendant for $160,000, which gave him a 50% interest in the company. The remaining 50 shares of stock were owned by Xhemali Shemshedini and Kibaret Semsedinouska.[1] On June 27, 2016, plaintiff entered into a stock purchase agreement with defendant wherein defendant agreed to pay him $80,000 in consideration for plaintiff's 50 shares. Defendant paid $40,000, and the remaining $40,000 was to be paid on or before November 2016. The stock purchase agreement further stated that if the $40,000 was not paid within 90 days of November 2016, defendant would owe plaintiff an additional $10,000. In the event of a default of the $50,000 payment, plaintiff could recover as damages either the $50,000 or reacquire his 50 shares of stock in exchange for paying defendant $20,000. Plaintiff argued that defendant had breached the contract by failing to pay him the amount due, and he requested the relief provided therein.

¶ 5    In defendant's answer, it admitted that plaintiff had agreed to purchase 50 shares for $160,000, but denied the inference that plaintiff paid the purchase price. Defendant also admitted that the parties entered into the June 27, 2016, stock purchase agreement. However, it raised the affirmative defense of want of consideration, stating that on August 1, 2012, plaintiff sold his 50 shares to Kibaret.

¶ 6    A bench trial took place on June 20 and August 8, 2019. Plaintiff provided the following testimony.  In the years prior to 2011, plaintiff was a close friend of Xhemil Shemshedini, the son of Xhemali and Kibaret Shemshedini. The Shemshedinis' bar went out of business, and because

---

[1] Xhemali is spelled "Xhamali" in the report of proceedings but not in documents in the common law record. Further, Kibaret Semsedinouska is also referred to as Kibaret Shemshedini in the record; she is Xhemali's wife.

plaintiff owned three convenience stores, they asked plaintiff for help to turn the bar into a convenience store. Plaintiff loaned the Shemshedinis thousands of dollars and gave them most of the inventory for the store, with a total cost to plaintiff of $50,000 to $60,000. The convenience store was not successful and closed within one year. Further, the property had an attached motel, and only one or two people were living there, without paying rent. The Shemshedinis then asked plaintiff to help convert the store back into a bar, and he agreed. Xhemil and his friends did most of the work, but plaintiff paid for all of the materials and labor. By March 2011, the bar had reopened. Plaintiff realized that the Shemshedinis were not able to repay all of the money he had lent them, so he agreed to accept half of defendant's shares.

¶ 7     On March 7, 2011, Kibaret and Xhemali sold plaintiff 50 shares of defendant, and they sold the other 50 shares to Xhemil. Plaintiff and Xhemil were named as defendant's directors, Xhemil was named president, and plaintiff was named secretary and treasurer. Plaintiff identified documents showing these transactions. In addition to the money plaintiff had loaned the Shemshedinis, he paid an additional $100,000 for the shares. Plaintiff did not currently have documentation for the money and products he had given the Shemshedinis.[2]

¶ 8     Plaintiff and Xhemil then began running the bar together, with plaintiff working nights and Xhemil working days. They also started remodeling the motel rooms and renting them out again. Xhemil was collecting the rent for the first six months to one year, but it "turned into a mess" because Xhemil never paid a $20,000 electric bill. Therefore, in 2012 or 2013 plaintiff started

---

[2] The March 7, 2011, contract, which was admitted into evidence, stated that plaintiff paid "the total sum of $10.00 and other good and valuable consideration."

collecting the rent and doing the bookkeeping. From 2012 to 2016, Xhemil never asked plaintiff to see the bookkeeping.

¶ 9    Plaintiff was shown a document dated August 1, 2012, that stated that he sold his 50 shares to Kibaret for "$10 and other good and valuable consideration." Although the signature at the bottom looked like his, plaintiff denied signing the document. Plaintiff was never informed by anyone that there was an issue with the bar's liquor license. In the years following August 1, 2012, plaintiff's role in the business did not change, and he was still collecting about $3,000 per month in rent from motel tenants. In plaintiff's tax returns for 2013 to 2015, plaintiff claimed the rental income and depreciation from the property, as a shareholder of defendant. Plaintiff filed the tax forms a couple of years late.

¶ 10    At some point between 2013 and 2015, there was a "raid" on the bar, and the police found three pounds of marijuana and a machine gun. As a result, Xhemil was charged with felony drug possession. The bar was fined $5,000 and had to remain closed for two or three days. Xhemil and plaintiff had a falling out over the incident. Shortly after the raid, Xhemil told plaintiff, "I quit, you can either run the place or lock it up, I don't care." Xhemil took a job driving a semitruck from about 2014 to 2016, and plaintiff barely saw him. During that time, Xhemil's father Xhemali would come into the bar and hang out, but he was not working. Further, Xhemali would be gone for three to four months in the summers, and he was also sick for a while. Xhemali would sometimes collect rent from the motel and keep the money.

¶ 11    Cassandra, plaintiff's girlfriend, was in charge of making sure that the bar was open, scheduling, making sure that the deposits got to the bank, and paying bills. The Shemshedinis were taking $1,300 per month out of the business account for their home mortgage, and Cassandra made sure that it was paid every month. She also paid the business taxes and insurance, and the electric

and cable bills when possible. Cassandra and Xhemali had access to the business checking account, but plaintiff did not because it was not necessary. In 2014 or 2015, plaintiff paid $9,000 for a new roof for the bar. Plaintiff drank a lot from 2014 to 2016 at the bar, but he denied that it affected his work. Still, he would have taken much better care of the business if he owned the entire company. He did not think that it was fair for him to run the business while Xhemil was making money doing something else. Plaintiff never earned an hourly wage for his work. Plaintiff was aware that Illinois Department of Revenue had alleged that the business had not paid all of the sales tax due for one or two years that plaintiff was in charge.

¶ 12    Plaintiff identified a letter addressed to him dated April 3, 2015, from defendant's attorney, Gregory Michael Scheurich. It had attached an unsigned contract for plaintiff to purchase 50 shares of defendant for $160,000. Plaintiff had asked Scheurich for the original purchase contract, but Scheurich rewrote the document instead. It contained mistakes such as being dated 2015 and stating that the payment was by certified check rather than cash. Plaintiff never signed the 2015 document.

¶ 13    When Xhemil returned from being on the road in early summer 2016, he accused plaintiff and Cassandra of stealing from the business. Plaintiff did not want to work with Xhemil any longer and agreed to sell his 50 shares of defendant. On June 27, 2016, plaintiff signed a receipt stating that he was selling his 50 shares for $80,000. Xhemil gave plaintiff $40,000 cash, and there was a balance due of $40,000. On June 30, 2016, they met at Scheurich's office to memorialize their agreement. Plaintiff had made the appointment with Scheurich but did not remember if he told Scheurich the purpose of the meeting. Plaintiff was in one room and Xhemil and Xhemali were in another room, with Scheurich going back and forth between the rooms to help them negotiate. Plaintiff and Xhemali signed a handwritten document stating that defendant agreed to purchase

plaintiff's 50 shares for $80,000, the receipt of which $40,000 was acknowledged. The remaining $40,000 was due by November 30, 2016, after which defendant was allowed an additional 90 days, until February 28, 2017, but would have to pay an additional $10,000. If the money was not paid, plaintiff could reacquire all 50 shares by returning all sums paid, minus $20,000. Plaintiff was never paid anything beyond the initial $40,000. Until he filed the lawsuit, no one ever questioned that he owned the 50 shares at the time he sold them back to defendant. Plaintiff was requesting that the trial court order that he be allowed to reacquire his 50 shares by paying $20,000 back, and that he receive court costs of $333.

¶ 14    Scheurich testified as follows. He had been licensed as an attorney for 47 years and began representing defendant as corporate counsel in 2011. Scheurich prepared the handwritten document dated June 30, 2016. He did not think that he had advance knowledge of why the parties were coming in that day. The parties had already negotiated the purchase price and had asked him to document it, but he helped them negotiate the payment terms. There was some discussion as to whether plaintiff fully owned the 50 shares, and to the best of Scheurich's recollection, it was because Xhemali alleged that plaintiff had not yet paid $20,000 that he owed for the stock. The issue of whether plaintiff owned the shares did not come up from the time the document was signed until one or two years before trial.

¶ 15    Scheurich remembered the document dated August 1, 2012, being prepared, and it stated that plaintiff sold his shares to Kibaret. Scheurich found a copy of the original document in the corporate folder he had with him at trial, though it was in a different section of the folder than he expected. It was possible that the discussion on June 30, 2016, about whether plaintiff owned the shares revolved around whether he had sold them already, but Scheurich did not recall that. It was also possible that Scheurich was not aware on that day that the August 1, 2012, agreement was in

his corporate folder; he did not recall looking in the folder that day. As far as everyone was concerned, plaintiff owned the 50 shares he was selling to defendant. It "appear[ed] to be" a mistake based on the August 1, 2012, agreement. Scheurich did not recall seeing plaintiff sign the 2012 agreement.

¶ 16 Scheurich remembered preparing the document dated April 3, 2015. He did not remember who asked him to do it, but because he mailed it to plaintiff, it was reasonable that plaintiff had requested it. Under the agreement, plaintiff would purchase 50 shares of defendant from defendant in 2015. It did "not precisely" correspond to the August 1, 2012, agreement, as that agreement stated that plaintiff sold his shares to Kibaret and not defendant. The April 3, 2015, document was not signed and therefore not valid. Scheurich did not recall any follow-up regarding the document. He admitted that it contained a typo stating that the shares were for "HeartSolutions, Inc." instead of defendant. Scheurich sometimes mailed out documents for parties to sign. He must have mailed the March 7, 2011, agreement because he had never met Kibaret directly.

¶ 17 Xhemali provided the following testimony. Defendant was incorporated in 1991, and from 1991 through 2010, he and Kibaret owned all of the shares. They transferred 50 shares of defendant to plaintiff in 2011 because he was a good friend of their son. Xhemali did not know if plaintiff ever gave any inventory or cash to defendant; plaintiff did not pay Xhemali anything. Xhemali and Xhemil paid for the convenience store to be converted back into a bar, and Xhemali did not know if plaintiff contributed any money. After selling defendant to plaintiff and Xhemil, Xhemali would go to the bar once in a while to check on things, but he was not involved in the business. He would also spend three to four months overseas. Rent money from the motel tenants went to pay the mortgage of Xhemali's home.

¶ 18 Xhemali did not ask Scheurich to prepare the August 1, 2012, document and did not

remember if he was present when it was signed. Plaintiff continued to work for the business after 2012. At some point Xhemil took a job with a trucking company for a couple of years, and plaintiff was running the bar and motel. Xhemali did not know if a new roof was put on the bar in 2015. Xhemali loaned Xhemil the $40,000 that he paid plaintiff in 2016. The agreement was between Xhemil and plaintiff, and Xhemali was not involved. He just signed the document he was told to sign.

¶ 19    Xhemil provided the following testimony. When they converted the bar into a convenience store, plaintiff provided $1,000 to $1,500 at a time for inventory, but he was always paid back. Xhemil was in charge of converting the convenience store back into a bar. The only assistance plaintiff provided was $5,000 and purchasing the bar stools. Xhemil admitted that he and plaintiff "didn't really pay much" to acquire the shares, but the plan was for them to fix up and run the business.

¶ 20    Xhemil did not recall who asked Scheurich to prepare the August 1, 2012, document. He remembered that he and plaintiff signed it together in Scheurich's office. He thought that Xhemali was also present but was not sure whether Kibaret was there. They transferred the shares back to Xhemil's parents because the Village of Machesney Park had sent a letter saying that plaintiff could not be a shareholder in a business with a liquor license because he was a felon. Xhemil did not have a copy of the letter. When asked if plaintiff transferred his shares because of the fear that the business would otherwise lose its liquor license, Xhemil testified: "It wasn't on fear of losing the liquor license because the liquor license was never under me or [plaintiff]. We're just going through to process [*sic*] of trying to get this place from my parents." When asked why plaintiff turned the shares back over, Xhemil testified, "I don't recall." He later testified that it was because plaintiff was a felon and could not be on a liquor license or an owner of a bar. After turning over

his shares, plaintiff was an employee. Xhemil believed that plaintiff simply took cash and paid himself.

¶ 21     Xhemil began driving a truck in the summer of 2014, and he would be gone from two days to one week at a time. In his absence, plaintiff and Cassandra were running the bar. Xhemil trusted plaintiff because he was a good friend, and Xhemil did not look into how things were operating. Xhemil was being paid $1,230 a month from the business, which went directly to his home mortgage. Xhemil left the trucking job in May or June 2016. Xhemil then checked into the business and learned that the bartenders were stealing, all of the bills were past due, and the bar had almost no inventory. The distributors had cut the bar off from buying liquor from them. Also, plaintiff was on a trip to Las Vegas using money from the business. Xhemil borrowed money to pay the bills and keep the bar operating. He and plaintiff had a big argument because Cassandra was still trying to take money out of the business account even when it was empty. Xhemil had Xhemali remove Cassandra's name from the account, which angered plaintiff.

¶ 22     On June 27, 2016, Xhemil agreed to pay plaintiff $80,000 for his shares, and he gave plaintiff $40,000 cash that day. At the time, Xhemil thought that plaintiff was still a shareholder. Xhemil believed that he called Scheurich ahead of time and to ask if plaintiff was a shareholder, and Scheurich said that he was. Plaintiff set up the June 30, 2016, meeting at Scheurich's office to discuss how the money would be paid. Xhemil again asked Scheurich if plaintiff was a shareholder, and he relied on the attorney's word that plaintiff was. Xhemil kept thinking about it later, and he remembered being at the office and signing the 2012 document. The day before the final payment was due, he went back to Scheurich's office. They went through the file and found the August 1, 2012, document. Xhemil told Scheurich that if plaintiff was not a shareholder, he was not going to pay him any more money. Xhemil did not know why he never demanded that plaintiff repay the

initial $40,000. Xhemil did not know the value of the business property, but a few years prior they had listed it for sale for $450,000 or $475,000. It did not sell at that time and was currently off the market.

¶ 23    We summarize the trial court's written memorandum order filed on August 16, 2019. It was undisputed that on March 7, 2011, equal shares of defendant were sold to Xhemil and plaintiff and that they were named the only members of the company's board of directors. There was testimony at trial that plaintiff did not actually pay to get the shares, but the parties' actions indicated a satisfaction with the arrangement and a course of conduct that appeared to recognize its validity. It was undisputed that from March 7, 2011, until sometime in 2016, plaintiff operated the business of Chuggers Sports Bar and Motel, initially with Xhemil's help but basically alone from approximately 2014 to 2016.

¶ 24    It was further undisputed that the parties signed the June 30, 2016, contract at Scheurich's office, after negotiations. There was no dispute that the initial $40,000 was paid to plaintiff, and that there had been no request that the money be returned. Scheurich testified that he did not recall any conversation at the time of the negotiations that plaintiff did not in fact own the 50 shares he was selling.

¶ 25    The crux of the parties' dispute was the document dated August 1, 2012. Plaintiff testified that he never saw and never signed it, whereas Xhemil testified that he and plaintiff signed it at Scheurich's office due to an issue with the bar's liquor license, with the Village of McChesney Park, or with both. Xhemil testified that he found out that plaintiff was a felon, and felons could not have liquor licenses. Moments later he testified that the liquor license was not in his or plaintiff's name, and that he had no fear of losing it. He subsequently testified that he did not know why plaintiff turned his shares over.

¶ 26    The trial court stated that Scheurich testified that the August 1, 2012, document was not signed at his office, and that he did not see plaintiff sign it anywhere. He thought that the document may have been prepared because plaintiff had not paid $20,000 that he was supposed to pay. The document was not discussed during the later negotiations, it was not something anyone asked him to look for, and he had no solid recollection of the document's circumstances. Xhemali said that he never knew about the document. Additionally:

> "In any event, based on the totality of the testimony, the parties did not behave in a manner that would indicate validity of the document. Nothing changed, according to the testimony, in regard to the manner business was conducted from 2011 until approximately 2014 when instead of running the business together, it became only [plaintiff] running it. Xhemil continued to be paid by direct deposit during the time he was gone. At no time was [plaintiff] paid with a W2 like an employee would be, and he was not treated, nor did he behave, like a mere employee. All decisions and actions for the business were left to plaintiff. Even if plaintiff had signed the document, it is clear that no one regarded it as 'valid' in terms of their actions and behavior and there was never any testimony about any consideration actually being paid to plaintiff. Regardless, again based on the totality of the evidence, it is more likely than not that it was not a valid contract."

¶ 27    The trial court continued that it was concerned that the June 30, 2016, contract was signed by Xhemali as president rather than Xhemil, who was defendant's president at the time. However, it was undisputed that they were both present and negotiating for plaintiff's shares, and that Xhemil paid plaintiff the $40,000. Even where an agent acted outside of the scope of his or her authority, the principal could ratify the agent's actions. Here, there was a ratification of the contract to preclude any issue with the person signing it.

¶ 28    The trial court ruled in favor of plaintiff and against defendant. It stated that the contract gave plaintiff the discretion of which option to exercise. It further awarded plaintiff court costs of $333.

¶ 29    Defendant filed a motion to reconsider on September 13, 2019, arguing as follows. Plaintiff did not own any shares of the business after signing the document dated August 1, 2012. Although there was a dispute about the existence and authenticity of the document, Scheurich produced the original document from his corporate file while he was on the witness stand. Further, the April 3, 2015, proposed agreement for purchase and sale, though never executed, provided additional objective evidence that plaintiff wanted to purchase the same 50 shares he previously sold on August 1, 2012. The only contrary evidence was plaintiff's unsupported claim that the document was a forgery. Considering the exhibits, plaintiff clearly offered no consideration for the June 30, 2016, contract, thereby invalidating it. Ratification did not apply because defendant was relying on incorrect information when entering into the contract.

¶ 30    A hearing on defendant's motion to reconsider took place on November 14, 2019, at which the trial court denied the motion. We summarize its reasoning. Defendant's argument hinged on whether the August 1, 2012, document was a true and accurate recitation of what the parties agreed to. Defendant acknowledged that there was a great deal of dispute about whether the document was "true." It was interesting that Scheurich could not at first find the document and then found it in a different and unexpected part of the file than where he would have kept it. Scheurich looked perplexed at locating it. It was not prepared by him or signed in his presence. It was "curious" considering plaintiff's claim that it was forged and not executed by him. Those were just two factors casting doubt on the document. There was also no consideration for plaintiff's sale of his

shares, and Xhemil did not know why plaintiff supposedly turned over his shares. Plaintiff claimed that he did not sell them, and the parties behaved as if he never had.

¶ 31    Defendant pointed to the April 3, 2015, document as additional proof of plaintiff's prior sale of his shares, but given that everyone agreed that it was never executed, the questions of how and why it was prepared were speculative. An unexecuted document with speculative lineage could be afforded little weight. Further, Xhemil's testimony about the August 1, 2012, document was purely self-serving and contradicted by Scheurich, Xhemali, and plaintiff, and by the behaviors and actions of both parties. There was nothing to show that the 2012 document was a valid contract, such that plaintiff had consideration to enter the June 30, 2016 agreement.

¶ 32    Defendant timely appealed.

¶ 33                                      II. ANALYSIS

¶ 34    Defendant argues that the trial court erred in ruling in plaintiff's favor, because there was no adequate consideration exchanged for the June 30, 2016, agreement. We note that in a bench trial, the trial court has a superior vantage point to observe and judge the witnesses' demeanor and credibility, compared to the cold record before the reviewing court. *Flynn v. Maschmeyer*, 2020 IL App (1st) 190784, ¶ 70. Therefore, we will defer to the trial court's factual findings unless they are against the manifest weight of the evidence. *Id.* Similarly, we will affirm a trial court's ruling after a bench trial unless it is against the manifest weight of the evidence. *Retirement Plan for Chicago Transit Authority Employees v. Chicago Transit Authority*, 2020 IL App (1st) 182510, ¶ 34. A decision is against the manifest weight of the evidence only if the opposite conclusion is apparent, or if the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Flynn*, 2020 IL App (1st) 190784, ¶ 70.

¶ 35    Defendant argues that the trial court "completely failed to address the affirmative defense for [*sic*] want of consideration," creating a "paramount error" in the trial court's decision. Defendant maintains that the evidence and testimony clearly established that plaintiff was not a shareholder of defendant at the time that the June 30, 2016, agreement was executed, such that he offered no consideration for the payment of $80,000. Specifically, defendant argues that the August 1, 2012, agreement showed that plaintiff sold his shares of defendant to Kibaret. Defendant acknowledges that plaintiff denied signing the document, but it argues that the following evidence contradicts plaintiff's claim: (1) Xhemil testified that he saw plaintiff sign the document; (2) plaintiff's signature on the document is consistent with his signature on other documents; (3) Scheurich recalled drafting the agreement; and (4) Scheurich was able to produce the original document from his corporate file while on the witness stand. Defendant cites *Welch v. Worsley*, 330 Ill. 172, 214 (1928), where the supreme court stated that where a question of paternity was raised more than 50 years since the plaintiff's birth, the written or documentary evidence presented at trial was more reliable "than the oral testimony of witnesses born 60, 70, or even 90, years before the lower courts heard this case."[3] Defendant argues that because there was a conflict in the testimony, the trial court should have relied more on the August 1, 2012, document. Defendant argues that the April 3, 2015, draft agreement was further objective circumstantial evidence that plaintiff did not own any shares of defendant on that date and desired to repurchase them.

---

[3] Defendant attributes a quote to this case that is not contained in the opinion but is rather a statement about *Welch* from an unpublished appellate court case, *Solomon v. Solomon*, 2016 IL App (1st) 142969-U, ¶ 45. An unpublished order is not precedential and may not be cited except in limited circumstances not present here. Ill. S. Ct. R. 23(e)(1) (eff. April 1, 2018).

¶ 36    Defendant additionally argues that the trial court erred in finding that it ratified the June 30, 2016, agreement. Defendant argues that Xhemil repeatedly asked Scheurich whether plaintiff owned any shares before defendant executed the agreement, and Scheurich answered in the affirmative. Defendant argues that it did not act upon and execute the agreement with the knowledge that plaintiff was not actually a shareholder at the time, such that it did not have the knowledge and correct information necessary to ratify any action consistent with the agreement.

¶ 37    The elements of a contract are offer, acceptance, and consideration. *BMO Harris Bank, N.A. v. Porter*, 2018 IL App (1st) 171308, ¶ 53. Consideration is the bargained-for exchange of promises or performances. *DiCosola v. Ryan*, 2015 IL App (1st) 150007, ¶ 16. Any act or promise that benefits one party or is a detriment to the other is sufficient consideration to support a contract. *Rohr Burg Motors, Inc. v. Kulbarsh*, 2014 IL App (1st) 131664, ¶ 48. "The burden of proving the validity of the affirmative defense of want of consideration is clearly upon the party asserting it." *Hamilton Bancshares, Inc. v. Leroy*, 131 Ill. App. 3d 907, 911 (1985).

¶ 38    As the trial court pointed out in this case, the question of whether there was adequate consideration for the June 30, 2016, agreement, is entirely dependent on the validity of the August 1, 2012, agreement. If the August 1, 2012, agreement was valid, there would arguably not be adequate consideration for the June 30, 2016, agreement, and defendant would prevail. In contrast, if the August 1, 2012 agreement was not valid, there is no question that plaintiff's ownership of the 50 shares would be adequate consideration for the payment provided in the June 30, 2016, agreement.

¶ 39    The trial court found that the August 1, 2012, agreement, was not a valid contract. Though it did not explicitly say so, it is clear that this finding was based on an underlying finding that plaintiff had not in fact signed the agreement. The trial court stated: "*Even if plaintiff had signed*

*the document*, it is clear that no one regarded it as 'valid' in terms of their actions and behavior and there was never any testimony about any consideration actually being paid to plaintiff. *Regardless, again based on the totality of the evidence, it is more likely than not that it was not a valid contract*." (Emphases added.) Defendant points to Xhemil's testimony that he and plaintiff signed the document at Scheurich's office, but the trial court did not find this testimony credible because plaintiff testified that he did not sign the document; Scheurich did not remember seeing plaintiff sign it despite the signing allegedly occurring at his office; and Xhemali did not remember whether the document was mailed to him or whether he was present when plaintiff allegedly signed it. Scheurich did not remember the subject of whether plaintiff had already sold his shares coming up at the June 30, 2016, meeting, even though Xhemil testified that he repeatedly asked him. Scheurich testified that the subject first came up one or two years before trial.

¶ 40    Significantly, Xhemil also gave conflicting testimony about why plaintiff would have signed the August 1, 2012, agreement, first saying that it was due to an issue with the bar's liquor license and/or the Village of McChesney Park because plaintiff was a felon, then saying that he did have a concern about the liquor license because it was not in either his or plaintiff's name, and then saying that he did not know why plaintiff turned over his shares. Though defendant argues that the August 1, 2012, agreement should be given more weight than conflicting testimony simply because it is a document, it is up to the trier of fact to assess the credibility of documentary evidence as well as witness testimony, and determine the weight to be given to evidence. See *Olson v. Lombard Police Pension Fund*, 2020 IL App (2d) 190113, ¶ 49. This is particularly true here because plaintiff alleged that his signature on the document was fraudulent.

¶ 41    Defendant also highlights that Scheurich found the original copy of the document in his corporate folder. However, the trial court explained at the hearing on the motion to reconsider that

the way that the document turned up cast doubt on it, in that it was in a different part of the folder than Scheurich would have put it in, and Scheurich looked perplexed at finding it. We note that Scheurich also testified that he sometimes mailed out contracts relating to the company, including the March 7, 2011, contract. Thus, it is possible that Scheurich mailed out the August 1, 2012, document, and it could have been sent back to him at an unknown date with plaintiff's forged signature.

¶ 42    Defendant's reliance on the April 3, 2015, draft agreement, is not convincing. The trial court explained at the hearing on the motion to reconsider that because it was unexecuted with conflicting testimony about its origin, it could be afforded little weight. Further, contrary to defendant's argument that it corresponds to plaintiff signing the August 1, 2012, agreement and then wanting to buy his shares back, Scheurich testified that it did "not precisely" correspond because under the August 1, 2012, agreement, plaintiff sold his shares to Kibaret, whereas the April 3, 2015, draft agreement listed the seller as defendant. Also, there was apparently no meaningful consideration for plaintiff to sell his shares in the August 2012 agreement, whereas the April 2015 draft agreement provides that he would spend $160,000 to purchase them. Indeed, the trial court stated that there was "never any testimony about any consideration actually being paid to plaintiff" in exchange for allegedly selling his shares in 2012. The $160,000 amount further corresponds to the amount that plaintiff claimed he paid for the original shares, which provides some support for his testimony that he asked Scheurich for a copy of the original purchase agreement, but Scheurich instead sent him a new document with errors.

¶ 43    Additionally, the trial court highlighted that even after plaintiff allegedly signed the August 1, 2012, agreement, "the parties did not behave in a manner that would indicate validity of the document." That is, they continued to run the business as before, and in fact, around 2014 plaintiff

ran it alone. He was not paid like a regular employee would be, and he made all of the business decisions with no oversight. All of the parties' actions were consistent with plaintiff not having signed the August 2012 agreement. Based on all of these considerations, the trial court's determination that the August 1, 2012, agreement was not valid was not against the manifest weight of the evidence. Plaintiff therefore provided adequate consideration in the form of his 50 shares for the June 30, 2016, contract, such that the trial court's ruling in plaintiff's favor was not against the manifest weight of the evidence.

¶ 44    Defendant's argument regarding ratification is misplaced, as the trial court was simply examining whether the fact that Xhemali signed the June 30, 2016, contract rather than Xhemil affected its validity. Defendant does not address this issue but instead maintains that because it did not know that plaintiff was not a shareholder on June 30, 2016, it could not have knowingly ratified any actions consistent with the agreement. However, given our conclusion that it was not against the manifest weight of the evidence for the trial court to find that the August 1, 2012, document was invalid, plaintiff was a shareholder on June 30, 2016.

¶ 45    Defendant additionally argues that the trial court erred in denying its motion to reconsider. In support, defendant restates its prior arguments almost verbatim. As we have found those arguments to be without merit, it follows that the trial court did not err in denying defendant's motion to reconsider.

¶ 46                                III. CONCLUSION

¶ 47    For the reasons stated, we affirm the judgment of the Winnebago County circuit court.

¶ 48    Affirmed.